[Cite as *In re Estate of Flowers*, 2017-Ohio-1310.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re Estate of Virginia Flowers

Court of Appeals No. L-16-1002

Dennis Dean Flowers, et al.

Trial Court No. 2012 ADV 0912

Appellee

v.

Joseph E. Siefer, et al.

**DECISION AND JUDGMENT**

Appellants

Decided: April 7, 2017

* * * * *

Kevin A. Heban, R. Kent Murphree and John P. Lewandowski,
for appellee.

John M. Carey and Jared J. Lefevre, for appellants.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellants, Joseph E. Siefer, the brother of Virginia Flowers, deceased, and

Cheri Fosnaught Pittman, Jerrie Fosnaught, and Mari Fosnaught Dutko, the daughters of

Flowers, appeal from the October 29, 2015 judgment of the Lucas County Court of Common Pleas, Probate Division, finding Flowers lacked testamentary capacity to change her beneficiary designation on July 6, 2010,[1] and that the change was due to undue influence. The trial court also denied the counterclaims of appellants to remove appellee, Dennis Dean Flowers, as executor of Flowers' estate and impose sanctions. For the reasons which follow, we affirm.

{¶ 2} On appeal, appellants assert the following assignments of error:

I. The trial court erred by admitting the opinions of non-testifying treating physicians into evidence.

II. The trial court erred by admitting the unreliable expert testimony of Thomas G. Sherman, M.D.

III. The trial court erred by admitting the testimony of Travis Rasor, M.D. as expert opinion on capacity.

IV. The trial court erred by admitting the testimony of Daniel K. Watkins as expert opinion on capacity.

V. The trial court's judgment was not supported by sufficient evidence at trial.

VI. The trial court's judgment was against the manifest weight of the evidence.

---

[1] The trial court stated the date the beneficiary designation was executed was July 2, 2010, but it was actually signed July 6, 2010.

2.

VII. The trial court erred by denying defendant's motion for new trial.

{¶ 3} Appellee brought suit as executor of the estate of Flowers against appellants and Edward Jones. In its October 29, 2015 judgment entry, the trial court narrowed the issues in the case to Flowers' capacity as of July 6, 2010, the date she changed her beneficiary designation for the funds held in an Edward Jones account from appellee to her daughters. The court also considered whether Flowers was susceptible to undue influence at that time.

{¶ 4} Following a trial to the bench, the probate court found that Flowers had suffered from a loss of mental capacity for some time prior to her move to Ohio, which was also most likely the cause of her loss of employment in 2007. The court found the expert opinions of Dr. Rasor and Dr. Watkins to be extremely compelling because they had actually examined Flowers near the time she executed the beneficiary designation. Therefore, the court held Flowers lacked the testamentary capacity as of July 6, 2010, to execute the change in beneficiary designation. The court further found Flowers' sudden change of beneficiary after coming to Ohio was inconsistent with her years of supporting appellee in opposition to her family and her prior testamentary acts. Thus the court found that her decision was due to undue influence. The court voided the change of beneficiary designation.

3.

**Summary of Trial Testimony**

{¶ 5} Flowers was trained as a nurse and married in Ohio before moving to South Carolina in the mid-1980s where she eventually became a head surgery nurse. Her daughters described their childhood and their relationship with their mother as typical. After her husband was killed in a work accident in 1993, Flowers received a structured settlement, which was placed in an Edward Jones account.

{¶ 6} In 1996, appellee met Flowers when he began working under her supervision. Flowers' children did not initially object to appellee, but they later questioned whether appellee was interfering with the relationship with their mother and was the cause of her irrational behavior. In March 1998, prior to Flowers' marriage to appellee on May 3, 1998, appellee sued two of the daughters, Mari Jo and Cheri, for defamation and obtained a civil protection order. The suit was settled when the parties apologized to each other in court. Afterward, however, the relationship between the mother and her daughters deteriorated. Mari Jo moved in with Cheri and the daughters stayed away from their mother and appellee.

{¶ 7} After appellee and Flowers were married, appellee quit his job and they lived off Flowers' income. After Flowers lost her job sometime between 2006 and 2008,[2] they lived off monthly withdrawals from her Edward Jones account. Appellee testified Flowers was close to his family and they spent time with them instead of her daughters.

---

[2] We note the witnesses gave inconsistent dates for the year in which Flowers lost her hospital position, but the trial court found the date to be 2007 and for purposes of this decision, we use this date to reference the event.

4.

Flowers executed a will on December 4, 2007, naming appellee as the sole beneficiary and his nieces as alternate beneficiaries.

{¶ 8} The extended family had always visited Flowers on a semi-annual or annual basis and continued to do so after she married appellee. During those visits, the family avoided talking about Flowers' relationship with appellee, although they observed that appellee was loud, demeaning, and abusive toward Flowers and she was afraid of him.

{¶ 9} From 1998 until 2010, the youngest daughter, Mari Jo, maintained some contact with her mother. However, shortly after Flowers lost her job at the hospital, she reconnected with her daughters and Flowers babysat for Cheri and corresponded with Jerri and Mari Jo who lived out of town. Their relationships deteriorated again, however, in 2007 during a family visit when Cheri discovered marijuana drying in a room over the garage and confronted Flowers and appellee in front of the entire family. Flowers asked Cheri to leave while appellee was standing over her. That was the last time the daughters saw their mother before she returned to Ohio in April 2010.

{¶ 10} Appellee testified Flowers did not show any signs of dementia prior to being "released" from her job for an unknown reason. She took a job at a nursing home facility as a charge nurse for a time, but no evidence was presented as to when she quit working altogether. Appellee testified that sometime in 2008, after Flowers' brother died in an automobile accident, Flowers no longer wanted to drive and he sold her car.

{¶ 11} In mid-2009, appellee noticed Flowers started to repeat herself and forget things. She spoke about her deceased brothers as if they were still alive. She had told

5.

appellee she did not like doctors, so he never took her to a doctor to be evaluated. Joseph Siefer testified that he saw Flowers for a week in 2009. At that time, she was exhibiting some cognitive problems with her memory. He did not feel comfortable riding with her driving a car. He recalled telling appellee it was time he worked and supported Flowers and got her some medical assistance. Flowers told Siefer she woke up one morning in 2009 and could not see, speak, or move. She later recovered, but her left side was affected.

{¶ 12} At the beginning of 2010, appellee testified he started to monitor Flowers' diet and hygiene because she would forget to eat, bathe, or wear clean clothes. She could no longer drive, cook, or clean. She spent the day playing with her dog, exercising, and helping with yard work. He handled all the family finances. Because she would get confused very easily and become disoriented, he applied to the Social Security Administration for Flowers on April 4, 2010, but the psychological examination to determine her competency was never completed.

{¶ 13} While appellee was on a camping trip to Florida from April 16 to 18, 2010, his mother took Flowers to the hospital because she was found wandering in the yard. Afterward, appellee's mother called the Siefers to pick up Flowers because Flowers wanted to go to Ohio. Appellee did not believe that Flowers had the mental capacity as of April 27, 2010, to make the decision of where to live. Her brothers, however, thought Flowers' mental state was about the same as when they had seen her in 2009. Siefer believed she improved after moving back to Ohio, until she began to decline from

6.

mid-2011 until her death in February 2012. They testified that her condition improved when she became more assured she would not return to live with appellee. Each time Flowers saw appellee, however, they observed she would become worse.

{¶ 14} In April 2010, appellee attempted to have the local police help him see Flowers. After meeting with Siefer and Flowers, who indicated that she did not want to see appellee, the police told appellee the family agreed to meet appellee with a lawyer present. Appellee did not want to meet without his own lawyer, so he returned to South Carolina and began legal proceedings there.

{¶ 15} Over the next two months, Siefer sought medical treatment for Flowers because of her memory issues. He did not believe a guardianship was necessary because the only issue at that time was with her memory. Siefer took Flowers to the local Edward Jones office to transfer her account to Ohio. She indicated to Siefer she wanted her children to have her assets, not appellee. She repeated this statement to each of her daughters who testified they did not raise the issue with her. The daughters also testified that Flowers apologized about how she had treated her daughters and allowed their relationship to fall apart and sought to reconcile with them.

{¶ 16} Flowers' brothers took her to meet attorney John Gouttiere on April 27, 2010. Gouttiere testified Flowers told him she had a stroke, although she could not recall the date, which had affected her right side, her speech, and her eyesight. Flowers could not remember when and where she married appellee. She indicated that she did not have a prior will. She knew she had accounts at Edward Jones, but could not recall if she had

7.

named appellee as beneficiary. As Flowers became comfortable, she told Gouttiere more about her history. Gouttiere spoke with Flowers privately to ensure that she wanted Siefer to be her attorney-in-fact, and she was unequivocal. A power of attorney was executed on April 29, 2010.

{¶ 17} Gouttiere recalled Siefer stating that Flowers had trouble dressing and could not be trusted to protect herself from hot water, to eat or stop eating, or to go to bed. Gouttiere noted that Flowers did not seem to be particularly oriented as to time and she could not tell the date, the year, or the President. On June 4, 2010, Siefer's wife spoke with Gouttiere and informed him that Flowers was making progress but could not live on her own because she could not be trusted to turn off water or put on clean clothes and she was always asking for help or direction.

{¶ 18} However, based on familiarity with the legal standard for contractual or testamentary capacity, Gouttiere opined Flowers knew her family members, the general extent of her assets, and that she wanted her daughters to inherit the assets, not appellee. Gouttiere had no doubt in his mind that she knew what she was doing and it was her choice. He had no doubt that she was capable of executing a will as she discussed her children, appellee and her accounts. He believed she had great insight into herself and her condition and was aware of her limitations. He did not believe anyone was trying to deceive him.

{¶ 19} Bob Ruckman, a financial advisor for Edward Jones, testified that he recalled first meeting Flowers in the spring or summer of 2010. He learned that she had

8.

relocated to Ohio and she indicated she wanted to change her beneficiary designation so that her three daughters would inherit the funds in her Edward Jones account. He did not ask her if she was married or if she had a prior beneficiary designation. He recalled recognizing she had some mental impairment because she was slow to answer and measured in her responses. However, he had no question that she knew what she was doing that day and he reviewed the form with her. He did not recall her brother speaking to her or doing anything that appeared dishonest or inappropriate. Ruckman typically spoke to the client privately, but he could not recall if that was done in this case. If Ruckman had observed Flowers exhibit some sort of distress or incapacity, he would not have accepted her instructions and would have asked someone to verify the information or assist her. He did not recall whether they discussed the details of the funds held at Edward Jones, but Ruckman would not have been able to access her account at that time. Seifer testified they met 5-6 times and reviewed her accounts every time.

{¶ 20} William Higley, an attorney specializing in Social Security Disability law for 40 years, with a bachelor's degree in psychology, testified he worked with Flowers in May 2010 to file a Social Security disability claim. He noted immediately she was mentally impaired because she had trouble answering questions. He deliberately spoke only to her and questioned her to assess her mental impairment and make sure she was competent to sign his fee agreement. Higley recalled having her read the fee agreement to him. Afterward, he read it to her, explaining it and she was able to explain the terms to him. He had no doubt that Flowers was competent to sign the fee contract. Higley

9.

recalled Flowers knew her brother and they appeared to have a good relationship. Higley did not observe Siefer exercise any control over Flowers.

{¶ 21} Higley testified Dr. Watkins' July 15, 2010, assessment of a GAF of 30 (global assessment of functioning scale) did not reflect the capacity of the woman he had met two months prior unless she had declined badly or was having a bad day. Nonetheless, Higley testified the GAF score has since been rejected as too subjective and Dr. Watkins' reports did not explain how he had derived the score and he did not include the raw scores. Higley noted similarities between his and Dr. Watkins' observations as well as significant differences. Flowers knew her location with Higley but not with Dr. Watkins. Higley also noted Dr. Watkins asked different questions than Higley. Dr. Watkins reported Flowers' full scale IQ was in the 50s, which would result in automatic approval by Social Security. Higley believed in this case the IQ of 51 reflected either that something was seriously wrong or there was an error in testing.

{¶ 22} Attorney Patricia Hayden Kurt testified she was retained to assist Flowers with filing a divorce action and to obtain a civil protection order. Their first meeting lasted about 30-40 minutes and a second two-hour meeting was held on May 21, 2010. Kurt could not recall the meeting entirely, but she took notes. She did recall, however, interacting with Flowers directly and immediately realized that something was wrong with Flowers. Kurt considered whether this was a case of PTSD from long-term domestic abuse based on her 33 years of dealing with people and the fact that Flowers was very afraid of appellee. Kurt questioned Flowers to test her mental capacity.

10.

Flowers knew who was President. Kurt believed Flowers knew where she was at that time and what she was asking Kurt to do. Kurt had made a notation "2002/todays date unknown," but she was not sure what that meant. Kurt also recalled they discussed the ongoing physical, emotional, and mental abuse Flowers' husband inflicted. Flowers spoke of wanting to keep him away so a civil protection order was sought. Kurt recalled telling Gouttiere this was the worst case of domestic violence she had ever seen.

{¶ 23} Kurt recalled that both Flowers and her brothers talked during the meeting but Kurt could not remember who supplied what information, except that Flowers herself told Kurt about Flowers' schooling and the annuity. Kurt believed the personal experiences came from Flowers as well. Flowers told Kurt there was an annuity from her first husband and appellee would force her to sign checks. Flowers was not sure what he was doing with the money. Kurt wrote notes about Flowers' education, work history, Flowers' children and their work. Flowers was able to talk about herself and her husband and identify her daughters. Flowers went into detail about appellee growing marijuana in the house; how her dogs were her only friends; that she woke up one day and could not talk; how she felt confined to the house; and how appellee would hit her with his hat.

{¶ 24} Both Cheri and Jerri saw their mother intermittently in the summer of 2010 and thought she had changed from 2007. They observed Flowers had become very shy, quiet, meek, reserved, and nervous, and had a slight difficulty with speech and spoke deliberately. But, both sisters believed their mother could fully communicate with them, continued to recognize family members, and recalled her first husband and appellee.

11.

Even in November 2011, Jerri recalled seeing her mother at a court proceeding in South Carolina and that her mother recognized Jerri and asked if she was ill because she was having trouble with allergies. Jerri was sure her mother was aware at that time what was going on around her.

{¶ 25} In May 2010, Flowers was taken back to her house in South Carolina to obtain some possessions. Appellee slipped her a note which he believed she could read, although he also testified she was nonresponsive and did not pet her dog whom she loved more than anyone. He had written in the note that if the dogs were left, he would put them down, but testified at trial he meant if the humane society did not take the dogs, he would have to put them down.

{¶ 26} Appellee filed an action for separate maintenance and support in May 2010. He also filed an action for a guardianship for Flowers and later instituted her estate administration in South Carolina.

{¶ 27} A civil protection order hearing was held in Ohio on July 23, 2010, and a recording of the hearing was played for the court. At the hearing, Flowers testified she was married to appellee. She did not know the date or her birthday, and stated she was 56, then 58. She did not remember the President's name, but recognized it when told. She testified all her money was gone. Flowers testified at the hearing she was afraid of appellee and that he had threatened her and hit her with his hat if she did not give him money. Gouttiere testified Flowers became much more intense when she saw appellee present. A civil protection order was issued

12.

{¶ 28} Eventually Flowers moved to live with her father on the family farm. Terry Siefer testified he saw Flowers weekly. Terry knew Flowers had trouble dressing because her arm did not function properly. He believed she was clear about what she did or did not like. She spent her time driving her golf cart around the farm and helping their father with the daily chores. Flowers continued to recognize everyone at family functions. She never expressed a desire to return to appellee. Terry was not aware of the change in the beneficiary designations, but he had heard Flowers state she did not want appellee to have any more of her money.

{¶ 29} Flowers' father testified Flowers lived with him from June 2010 until shortly before she died. He testified he had to give her 24/7 care as he had done for her mother. His other children testified that the elder Flowers may have confused Flowers for her mother or simply treated her the same. In June 2010, Flowers' father observed she could not dress or groom herself. He did not trust her to use the stove or to be left alone, but she could follow directions. He recalled that she had trouble in 2009 and needed medical care. She had not changed much when he saw her in 2010. He did not see her make any improvement in 2010 and near the end of her life she suddenly became much worse. However, he also testified that she always knew her location and recognized him and her family. She enjoyed visiting with her brother and loved her daughters.

13.

**Medical Opinions Regarding Flowers' Competency**

{¶ 30} The certified copies of medical records from Flowers' admission on April 18, 2010, to a hospital in South Carolina were admitted into evidence. The chief complaint was Flowers' "altered mental state." The doctor's clinical impression was that Flowers perhaps had Alzheimer's dementia.

{¶ 31} Certified copies of the medical records of Flowers' family physician, Dr. Rasor, were admitted into evidence. The records indicated that Dr. Rasor first examined Flowers on May 3, 2010, and had conducted a hair analysis on May 28, 2010, and found no evidence of illicit drug use. He noted that Flowers had to stop and think about commands before performing them and searched for words during speaking. He recommended that she see a neurologist. Included within Dr. Rasor's records was a letter to Dr. Rasor from Dr. Saraiya, the neurologist who examined Flowers on June 4, 2010.

{¶ 32} Dr. Rasor testified that in his ordinary family practice he has assessed a patient's mental status and has had experience with patients who had dementia. However, he had no training or expertise in neurology, psychiatry, psychology, organic brain disorders, or legal standards for contractual or testamentary capacity in Ohio. Nonetheless, he believed he was qualified as a family physician to render an opinion as to Flowers' mental state because of his general medical training and experience.

{¶ 33} Dr. Rasor first met Flowers May 3, 2010. Physically, she was in good health. Dr. Rasor recalled Flowers was accompanied by her family who provided some of her history and how her memory issues had begun three years earlier. While his

14.

records reflected that he found Flowers was "oriented within normal limits" that day, he testified she was disoriented as to the date and year. He could not recall asking her about her location. Flowers responded to Dr. Rasor's questions in very short, sometimes labored answers. She seemed to struggle with finding words and forming answers. He did not specifically test her memory. Because she was only 58 years old and had significantly declined over a short period of time, he made a diagnoses of "memory impairment" and referred her to a neurologist. Several visits later, after receiving Dr. Saraiya's report, Dr. Rasor prescribed a drug to help with dementia. Dr. Rasor further testified he never observed Flowers' memory issues improve over the summer of 2010.

{¶ 34} Dr. Rasor opined that in July 2010, Flowers did not have the ability to balance a checkbook, purchase a car, understand the nature and extent of her assets, or the mental capacity to execute beneficiary designations. However, he admitted he never observed her do any of these functions nor did he conduct any tests. He also never asked her about her assets and never conducted any memory loss tests. He based his opinion on his own observations as a physician and the "consultation" notes and objective testing of Dr. Saraiya and Dr. Watkins, who did testify at trial. Dr. Rasor believed that physicians who actually examined Flowers were in the best position to assess her mental capacity.

{¶ 35} Dr. Saraiya's letter to Dr. Rasor was admitted into evidence as part of Dr. Rasor's medical file and she did not testify. Dr. Saraiya stated in her letter that she considered information supplied by Siefer regarding Flowers' history, the medical records from the South Carolina hospital and diagnostic testing results recorded in the

record, and her own observations made during her examination of Flowers. Dr. Saraiya noted Flowers was alert, she did not know the year or month, she could repeat, she had expressive aphasia but sometimes could speak a fluent sentence relevant to the content, she could tell some remote history, she could recall some anatomical knowledge from her nurse training, but there were some paraphasic errors; her memory recall was zero; her comprehension was fairly intact; and she had significant apraxia. Dr. Saraiya opined that Flowers definitely had brain damage from a stroke or vascular dementia, despite the absence of significant stroke risk factors. Dr. Saraiya opined that early dementia was a likely possibility. She also suggested that psychiatric conditions, depression, and conversion would possibly have caused the damage because Flowers had experienced significant emotional disturbances over many years.

{¶ 36} On July 15, 2010, shortly after the beneficiary designation was executed, Daniel Watkins, Ph.D., a psychologist, evaluated Flowers at the request of the State of Ohio, Division of Disability Determination, to determine if she had cognitive and emotional deficits that would qualify her for Social Security disability. Dr. Watkins testified he had no independent recollection of Flowers but testified about the results of his examination summarized in his report admitted into evidence. His examination was for purposes of measuring Flowers' four abilities related to her ability to work: the ability to understand, remember, and follow instructions (she was extremely impaired); the ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks and multi-step tasks (she was markedly impaired); the ability to relate to

others (she was markedly impaired); and the ability to withstand the stress and pressure associated with day-to-day work activity (she was extremely impaired).

{¶ 37} Dr. Watkins noted in his report Flowers was slow, her eye contact was fair, and she was a poor historian because of her memory gaps. He was able to understand her, but she spoke hesitantly, stuttered, and had trouble finding words and with pronunciations. Some of her statements were irrelevant to the topic or question at hand. She did not appear to be anxious. When questioned to assess her memory recall, she could answer some questions, but not all. He found her mental arithmetic skills were significantly impaired. She could recall four digits forward, but not backwards. She could define words. She could not comprehend instructions to complete the Wechsler Adult Intelligence Scale ("WAIS") tasks. He concluded that her judgment skills did not appear to be adequate for the purposes of simple work-related decision-making. Her IQ score was 51, which he opined was consistent with someone who had dementia because she had declined to this level. He gave her a GAF score (an estimate of her general functioning) of no greater than 30 because of her "significantly impaired" memory and loss of executive function. Neither score was what he would have expected with her education and employment history. While the GAF is no longer used because of its subjectivity, he would have expected a score of 70-80.

{¶ 38} Dr. Watkins believed she had dementia with memory and concentration problems and difficulties with executive function. She did not have the ability to make ordinary work-related decisions of what to do first. While Dr. Watkins opined that

17.

Flowers could not have looked at stock reports and made investment decisions, she might have been able to determine to whom she wanted to give her money. He found her insight was intact, which meant she could know and understand she was having cognitive problems.

{¶ 39} Austin John McSweeny, III, a psychologist/professor with a clinical practice in neuropsychology where he regularly evaluates patients, and an attorney, evaluated the record in this case and testified regarding his opinion of Flowers' testamentary capacity. McSweeny believed the coroner's diagnosis was based on the statement of others since no autopsy was performed and Flowers never had a thorough dementia evaluation. He also testified the etiology of her dementia was not clear; but the crucial aspect was the effect of the dementia on testamentary capacity, not the degree of the dementia. He applied the methodology used for determining whether Flowers had the tools to enable her to have testamentary capacity written about in the ABA, APA manual, and other publications.

{¶ 40} He believed it was clear Flowers was suffering from a progressive, dementing illness that existed over a matter of years, not months, and started between 2006 and 2008. Because of her dementia, Flowers would have been susceptible to the influence of others, but he found no evidence of undue influence. He opined that Flowers exhibited impairment as to both short and long term memory, but she had testamentary capacity in the summer of 2010 to a reasonable degree of medical certainty. He testified that Flowers' need for 24/7 care was not determinative of her testamentary capacity,

18.

which depended upon her behavior during the actual act of making the change in her beneficiary. He did give credit to the testimony and observations made by lay people even if they were not psychiatrists and did not understand the significance of their observations. He gave great weight to the financial advisor's four basic questions of Flowers, which she answered appropriately: She understood basically the money involved, she understood who would get the money, she understood her relationship to these people (although they did not discuss appellee), and she understood the consequence of what she was doing. If the financial planner had not asked her any questions about the money involved, Dr. McSweeny would have found the financial planner's assessment incomplete. Dr. McSweeny also gave some weight to Higley's opinion that Flowers had legal capacity based on her engagement and discussion of his fee contract. Dr. McSweeny gave less weight to the observations of Flowers' family physician, Dr. Rasor, because he did not ask questions to determine Flowers' testamentary capacity. Dr. McSweeny also put great emphasis on Flowers' answers in the civil protection order hearing because she knew her relationship to different people in her family and their names; she acknowledged that she was married to appellee; she knew she lived with her brother; and she was able to recall her first husband and knew he was the father of their three daughters. McSweeny did not give as much weight to Dr. Watkins' report because it was completed for the purposes of obtaining disability benefits, not for determining her testamentary capacity, and the GAF is subjective and unreliable. Dr. McSweeny noted that while Flowers may have lacked general financial

capacity, she had testamentary capacity. She would not have been able to purchase a house or a car and understand all the implications related to it. But, she could still have the specific financial capacity or contractual capacity to make a change in her IRA because that is a different type of contract than buying a house or car.

{¶ 41} Dr. Sherman, a psychiatrist, also reviewed the record in this case. His first report was prepared January 29, 2013. In that report, he considered the following findings of the other medical professionals and concluded that there was an agreement she had progressive dementia: Dr. Jayanti on 2/7/12 "altered mental status"; St. Ann's Hospital care progress notes "progressive emotion and cognitive decline"; St. Ann's Hospital psychiatric evaluation 2/9/12 "dementia"; St. Ann's Hospital physician progress notes of 2/9/12 "non-verbal dementia"; the palliative care consultation of 2/9/12 "probable frontal temporal lobe dementia onset approximately 2006 -- 'non-functional status'"; South Carolina hospital notation on 4/18/10 that "patient is a poor historian, dementia"; and the hearing where Flowers was unable to accurately state the time, date, place, or President. He also noted that later medical records indicated that her dementia was a particularly progressive type, a "Prion disease." He opined that the early onset in her case made this diagnosis more likely than Alzheimer's disease. While he saw a few descriptions of partial lucidity, he did not believe that a progressive dementia of this type could have cleared enough for her to make any competent decision in July 2010 and she would have been likely susceptible to the influence of others.

20.

{¶ 42} At trial, Dr. Sherman testified that his postmortem competency evaluation was unusual in that he also had the transcript of the civil protection order hearing to review, in addition to medical records, the coroner's report, and the depositional testimony of others about Flowers' mental status. Dr. Sherman, who was familiar with the legal standard for competency, opinioned to a reasonable degree of medical certainty, that when Flowers changed the beneficiary designation, she was suffering from a significant neurological disorder and was incompetent. He believed Flowers would not have had the mental capacity to understand that she was changing disposition of her assets, would not have been competent to do even simple business decisions, would not have understood the nature and extent of her assets and would have been susceptible to the influence of others without the mental capacity to resist influence. He did not believe Flowers would have been capable of having lucid moments.

{¶ 43} Dr. Sherman testified as follows. The autopsy revealed the number one cause of death was "frontotemporal dementia, clinical," a rapidly progressive dementia. "Clinical" meant the disease was diagnosed from symptoms rather than microscopic evaluation of her brain samples. No matter what type of dementia she had, it progressed rapidly and left her basically incapable of any kind of sound decisions. Unlike other kinds of dementia, nothing could have been done to slow down the progression of the disease and she would not have shown improvement. Normally, this type of dementia would have begun with errors in judgment and decorum, a lack of propriety, and a

21.

change in dietary habits, such as overeating; but not necessarily any significant loss of memory. By the time memory problems would have been seen, the dementia would have been fairly advanced. This type of dementia can continue for years, but not decades.

{¶ 44} Dr. Sherman observed from the records that Flowers lost her R.N. position and never obtained another job, indicating to him that her dementia may have begun in 2006. He saw deterioration beginning as early as 2007 and 2008 through her impaired judgment and the observations that she could not be trusted around the stove, did not know when to turn the water off, and did not know when to stop eating. Appellee had testified Flowers repeatedly sprayed weed killer on same spot, which indicated to Dr. Sherman she could not comprehend something else was required.

{¶ 45} Dr. Sherman also considered her IQ score of 51 as significant and agreed with Dr. Watkins' assessments. Dr. Sherman believed that if Flowers was unable to duplicate a block pattern, there was no way she had testamentary capacity. Dr. Sherman testified memory recall is part of the competency assessment because one must be able to recall memories to make judgment determinations. The memory recall score of zero determined by Dr. Saraiya indicated that Flowers was at the bottom of the continuum. Dr. Sherman gave no weight to the opinions of the lawyers or financial advisor in this case because he believed only medical professionals are capable of making a sound judgment regarding mental status.

{¶ 46} Dr. Sherman also testified that some demented individuals become paranoid, but the only evidence of overt paranoia in Flowers' case was the civil

22.

protection order.  However, considering the cognitive defects she had, Dr. Sherman could not believe she could have instituted the action on her own.

### Admissibility of Dr. Saraiya's Medical Diagnosis

{¶ 47} **First Assignment of Error**.  Appellants argue the trial court erred by admitting into evidence, over objection, the *full* medical report of Dr. Rasor as a certified business record pursuant to Evid.R. 803(6) and 901(B)(10).  Appellants argue that within that report is the letter from Dr. Saraiya, with her medical opinion, which they argue is inadmissible hearsay because she did not testify at trial and was not subject to cross-examination, her report was not authenticated, there was no foundation laid for her opinion, and her letter does not fall within the exception of Evid.R. 803(6).  The probate court allowed the letter to be admitted to the extent that other doctors relied upon it in reaching their opinions.

{¶ 48} Clearly, the diagnosis and opinion of Dr. Saraiya was hearsay because she did not testify at trial.  Evid.R. 801(C).  The issue in this case is whether her medical diagnosis and opinion was admissible under an exception to the hearsay rule, the business records exception of Evid.R. 803(6).  Because Evid.R. 803(6) sets forth a basis for admission of hearsay, we do not review the trial court's decision under the typical abuse of discretion standard applied to evidentiary decisions.  We must consider whether the court erred as a matter of law.  Even if hearsay evidence was erroneously admitted based on Evid.R. 803(6), an appellate court will not reverse the trial court's judgment unless the

error prejudicially affected a substantial right. Evid.R. 103(A); *Meyers v. Hot Bagels Factory*, 131 Ohio App.3d 82, 100-101, 721 N.E.2d 1068 (1st Dist.1999).

{¶ 49} Prior to adoption of Evid.R. 803(6) in 1980, the General Assembly adopted the Uniform Business Records as Evidence Act in 1939 as Gen.Code, § 12102-22 et seq., currently found at R.C. 2317.40, in order to make the evidentiary rules of Ohio uniform to those of other states regarding the admissibility of business records. Evid.R. 803(6); *Smith v. Dillard's Dept. Stores*, 8th Dist. Cuyahoga No. 75787, 2000 Ohio App. LEXIS 5820, *11. In *Weis v. Weis*, 147 Ohio St. 416, 425, 72 N.E.2d 245 (1947), the Ohio Supreme Court held that the purpose of the statute was "to liberalize and broaden the shop-book rule, recognized at common law as an exception to the general rule excluding hearsay evidence, and to permit the admissions of records regularly kept in the course of business and incident thereto* * *." *Id*. The court further found that hospital records are admissible under the statute as business records if the conditions of the statute at met. *Id*. at paragraph three of the syllabus. While the court defined "hospital records" as including a doctor's diagnoses, *id*. at 425, the *Weis* case did not actually involve the admission of a doctor's diagnosis.

{¶ 50} The Tenth Appellate District considered whether a specialist physician's diagnosis or opinion could be admitted as part of the medical record of a treating physician's records under the statutory business record exception in *Hytha v. Schwendeman*, 40 Ohio App.2d 478, 482-483, 320 N.E.2d 312 (10th Dist.1974). The court of appeals held the specialist's diagnosis could be admitted following a prior case,

24.

*Dillow v. Young*, 3 Ohio App.2d 110, 209 N.E.2d 623 (10th Dist.1965), *rev'd on other grounds* in 6 Ohio St.2d 221, 217 N.E.2d 868 (1966).  However, the court of appeals excluded the record in that case because the report was not created in the regular course of business of the treating physician, contained objective and subjective opinions of the patient's condition, had not been properly authenticated, it did not include any foundation regarding the qualifications of the specialist to make the opinions stated, and the letter contained irrelevant evidence.  *Id*. at 486.  The court set forth in its syllabus the following seven criteria for evaluating whether a medical diagnosis contained in a medical record is admissible, which have been recited by subsequent courts despite the fact that the law stated in an appellate opinion is found in the text of the opinion and not the syllabus:

(1) The record must have been a systematic entry kept in the records of the hospital or physician and made in the regular course of business;

(2) The diagnosis must have been the result of well-known and accepted objective testing and examining practices and procedures which are not of such a technical nature as to require cross-examination;

(3) The diagnosis must not have rested soley [sic] upon the subjective complaints of the patient;

(4) The diagnosis must have been made by a qualified person;

(5) The evidence sought to be introduced must be competent and relevant;

(6) If the use of the record is for the purpose of proving the truth of matter asserted at trial, it must be the product of the party seeking its admission;

(7) It must be properly authenticated. *Id*. at the syllabus.

**{¶ 51}** Evid.R. 803(6), promulgated by the Ohio Supreme Court, is nearly identical to R.C. 2317.40. Fed.Evid.R. 803(6), however, specifically indicated that "opinions or diagnoses" can be admissible as a business record. Nonetheless, the Ohio Supreme Court has held that the rule "shall be construed as stating the common law of Ohio unless the rules clearly indicate that a change is intended." *Mastran v. Urichich*, 37 Ohio St.3d 44, 49, 523 N.E.2d 509 (1988).

**{¶ 52}** Therefore, the Tenth Appellate District continues to apply the *Hytha* test for admission of a medical opinion or diagnosis under Evid.R. 803(6). *Jefferson v. Careworks of Ohio, Ltd.*, 193 Ohio App.3d 615, 2011-Ohio-1940, 953 N.E.2d 353, ¶ 10 (10th Dist.). We have adopted this analysis as well. *Gallagher v. Firelands Regional Med. Ctr.,* 6th Dist. Erie No. E-15-055, 2017-Ohio-483, ¶ 23-30. *Compare Guarino-Wong v. Hosler*, 1st Dist. Hamilton No. C-120453, 2013-Ohio-1625, ¶ 15; *Bush v. Burchett*, 4th Dist. Scioto No. 94CA2237, 1995 Ohio App. LEXIS 2488, *8-9 (June 13, 1995) (medical opinions and diagnoses are "per se" inadmissible under Evid.R. 803(6).)

**{¶ 53}** We agree Dr. Saraiya's letter to Dr. Rasor was not admissible hearsay under Evid.R. 803(6). As in the *Hytha* case and *DeVries v. Paseff,* 6th Dist. Wood No. WD-01-014, 2002-Ohio-602, *22-23, we find the specialist's report included more than

26.

observable facts, it was not authenticated, there was no foundation laid for her expert opinion, and it was not a record kept in the regular course of Dr. Rasor's medical practice. Such records constitute double hearsay. *Golden v. George Gradel Co.*, 6th Dist. Lucas No. L-88-091, 1989 Ohio App. LEXIS 492, *9 (Feb. 17, 1989).

{¶ 54} We next consider whether appellants were prejudiced by the admission of Dr. Saraiya's report because Dr. Sherman and Dr. Rasor relied upon it in forming opinions of Flowers' testamentary capacity as of July 2010.

{¶ 55} Dr. Saraiya's "diagnosis" was not definitive in this case. She suggested early dementia was a likely possibility as well as a stroke, psychiatric conditions, depression, and conversion. She also set forth observable facts and test results.

{¶ 56} Dr. Sherman identified at his deposition the factual observations and testing results of Dr. Saraiya's report that he considered important. He also noted that Dr. Saraiya suggested early dementia was a likely possibility. At trial, Dr. Sherman testified that he relied upon the medical records, which included Dr. Saraiya's neurological assessment. Dr. Rasor testified he based his opinion in part on the "consultation" notes and objective testing of Dr. Saraiya. Both doctors agreed with Dr. Saraiya's suggested diagnosis.

{¶ 57} While Dr. Sherman and Dr. Rasor agreed with Dr. Saraiya's opinion, there was no indication they based their opinions simply upon the diagnosis of Dr. Saraiya. Dr. McSweeny also considered the entire record, including Dr. Saraiya's letter, and agreed there was no doubt Flowers had dementia. Dr. Watkins, who made his own independent

27.

diagnosis, also determined that Flowers had dementia. The central issue, however, was not whether Flowers had dementia, but whether the dementia had impacted her testamentary capacity. Therefore, upon a review of the entire record, we do not find that appellants were prejudiced by the admission of Dr. Saraiya's report into evidence. Appellants' first assignment of error is found not well-taken.

## Admissibility of Expert Testimony

## Assignments of Errors Nos. 2, 3, and 4

{¶ 58} **Appellate Standard of Review**. Evid.R. 702 provides that a witness may testify as an expert if his testimony "relates to matters beyond the knowledge or experience" of the average juror, the expert has "specialized knowledge, skill, experience, training, or education" about the matter, or the testimony is based on "reliable, scientific, technical, or other specialized information." The expert's opinion can be based on facts admitted into evidence or facts the expert perceived. Evid.R. 703. Knowing the foundation of the expert's opinion ensures the factfinder "can determine the validity of the expert's opinion." *Lucitte v. Lucitte (In re Estate of Lucitte)*, 6th Dist. Lucas No. L-10-1136, 2012-Ohio-390, ¶ 53. The opposing party bears the burden of proving the expert's opinions are unsupported by the facts. *Holman v. Shiloh Grove L.P.*, 10th Dist. Franklin Nos. 15AP-228, 15AP-797, 2016-Ohio-2809, ¶ 20.

{¶ 59} The expert must also render an opinion to a reasonable degree of scientific certainty and cannot render a subjective opinion. *State v. Jackson*, 92 Ohio St.3d 436, 448, 751 N.E.2d 946 (2001). The expert's opinion must be reliable; it must be based on

28.

scientifically-valid principles. *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998), paragraph one of the syllabus. The trial court acts as a gatekeeper and must determine "both the reliability of an expert's methodology and the relevance of any testimony offered before permitting the expert to testify." *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 24. Qualification of an expert is a matter within the sound discretion of the trial court. Evid.R. 104(A); *Celmer v. Rodgers*, 114 Ohio St.3d 221, 2007-Ohio-3697, 871 N.E.2d 557, ¶ 19. On appeal, the trial court's ruling will not be reversed absent a showing of an abuse of discretion. *Id*. We will not find an abuse of discretion unless the record shows the court's evidentiary ruling was "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.Ed.2d 1140 (1983).

{¶ 60} **Second Assignment of Error**. Appellants argue appellee's sole expert, Dr. Sherman, initially opined that Flowers lacked capacity to execute the beneficiary designation change in favor of her daughters because she likely suffered from a "so-called 'Prion disease,'" an extremely rare disorder known as Creutzfeldt-Jakob Disease. Appellants moved in limine to exclude his opinion because the trial court found, in a July 17, 2015 judgment that such a diagnosis was improbable based on judicially-noticed facts. The trial court denied appellants' motion in limine.

{¶ 61} Before the trial began, appellants presented arguments in support of their second motion in limine. They argued that Dr. Sherman's opinion that Flowers suffered from a prion disease, most likely Creutzfeldt-Jakob Disease, is methodologically

29.

unreliable because the CDC diagnostic criteria requires brain tissue to be examined before making this particular diagnosis, which was not done in this case.

{¶ 62} The trial court denied the motion in limine holding that the issues could be thoroughly covered through the cross-examination of the witnesses and the court's reconsideration of this issue during deliberation because the case was being tried to the bench. At trial, Dr. Sherman refused to offer an opinion as to the cause of Flowers' dementia which caused her alleged incapacity.

{¶ 63} On appeal, appellants first argue Dr. Sherman changed his opinion at trial from the opinion he initially disclosed in his report and deposition testimony. They argue this action constituted unfair surprise and his opinion should have been excluded from evidence.

{¶ 64} Civ.R. 26(E)(1) requires that a party supplement discovery requests regarding the subject matter on which an expert is expected to testify so that a party may prepare for effective cross-examination of the expert. *Werden v. Children's Hosp. Med. Ctr.,* 1st Dist. Hamilton No. C-040889, 2006-Ohio-4600, ¶ 67, fn. 41, citing *Shumaker v. Oliver B. Cannon & Sons, Inc.*, 28 Ohio St.3d 367, 370, 504 N.E.2d 44 (1986). The admissibility of "surprise" testimony is a matter left to the discretion of the trial court. *Williams v. Reynolds Rd. Surgical Ctr.*, 6th Dist. Lucas No. L-02-1144, 2004-Ohio-1645, *8.

{¶ 65} In the case before us, we do not find that the substance of Dr. Sherman's opinion significantly changed. In his written report of January 29, 2013, he stated that all

30.

of the medical records were in agreement that Flowers "had a progressive dementia * * * with a few descriptions of even partial lucidity. It is unlikely that a progressive dementia of the type suffered by [Flowers] could have 'cleared' enough for her to make any competent decision in July 2010. Progressive dementias of this type typically produce the bewilderment that she demonstrated in her deposition [CPO hearing transcript] making it likely that she be susceptible to the under [sic] influence of others."

{¶ 66} However, at his deposition, Dr. Sherman opined that Flowers suffered from a prion disease. He noted that a diagnosis of a prion disease had not been made because it can only be done by autopsy. He opined in Flowers' case, the symptoms "behaved that way. It was a progressive, rapidly progressive, dementia, unlike Alzheimer's disease." He also opined that her dementia may have been caused by Creutzfeldt-Jakob disease, one type of Spongiform Encephalopathy, a cause suggested by one of the physicians in the record. When questioned about the coroner's finding that Flowers had died from complications of frontal temporal dementia (which Dr. Sherman had not seen earlier), Dr. Sherman emphasized that the focus of his opinion was that Flowers had a "generally rapidly progressing dementia" and "was not very functional for years." He testified his opinion was not "necessarily that she had Creutzfeldt-Jakob Disease." Furthermore, he opined the dementia would make her vulnerable to the influence of others.

{¶ 67} At trial, Dr. Sherman emphasized that he had not made a specific diagnosis in this case that Flowers suffered from a prion disease. He agreed the suggestions of other physicians and the coroner were all possibilities. However, he believed a diagnosis

31.

of the cause of the dementia was irrelevant. He believed the important factor was that this was a particularly rapid, progressive dementia, which began perhaps as early as 2006 or 2007 when she lost her job.

{¶ 68} Upon a review of all of the evidence, we find that Dr. Sherman consistently opined that Flowers suffered from a rapidly-progressing dementia which prevented her from having the testamentary capacity to change her beneficiary designation on July 6, 2010. While his supposition about the cause of her dementia waivered, Dr. Sherman acknowledged from the beginning that the cause of the dementia could not be definitively determined without an examination of brain tissue during an autopsy. However, based on clinical observations, he believed the underlying disease could have been a prion disease or the coroner's opinion of frontotemporal dementia.

{¶ 69} Secondly, appellants argue that Dr. Sherman's failure to opine a cause for Flowers' dementia eliminates a foundation for his opinion regarding the effect the disease would have had on her testamentary capacity.

{¶ 70} Dr. McSweeny, like Dr. Sherman, testified that because Flowers did not have her brain tissue analyzed during an autopsy, the etiology of her dementia was not certain. Dr. McSweeny testified the coroner's diagnosis appears to have been a statement of what others had said. Dr. Sherman testified he could not disagree with the coroner's conclusion. While the cause of her dementia was relevant because it could shed light on the expected progression of her dementia, knowing the cause did not prove the ultimate issue of whether Flowers possessed testamentary capacity on July 6, 2010. Both of these

32.

witnesses based their opinion of Flowers' competency upon her behavior and test results, which they utilized to determine her cognitive ability. Therefore, we find that Dr. Sherman's testimony was reliable.

{¶ 71} Thirdly, appellants argue that proof of dementia alone is insufficient to establish a lack of testamentary capacity. We agree. *Stewart v. Boland (In re Estate of Probst)*, 2015-Ohio-1712, 33 N.E.3d 551, ¶ 15 (1st Dist.); *In re Estate of Marsh,* 2d Dist. Greene No. 2010 CA 78, 2011-Ohio-5554, ¶ 34. In this case, Dr. Rasor and Dr. Sherman testified that Flowers' dementia did negatively impact her testamentary capacity.

{¶ 72} Appellants further argue that Dr. Sherman's opinion should have been excluded because it was merely supposition based on the dementia-like systems described by physicians who were not assessing her testamentary capacity. We find this argument lacks merit.

{¶ 73} Testamentary capacity can be proven by evidence of a person's mental and physical condition a reasonable time before and at the time of the testamentary act. *Marsh* at ¶ 18, quoting *Bustinduy v. Bustinduy*, 2d Dist. Champaign No. 98-CA-21, 1998 Ohio App. LEXIS 6047 (Dec. 18, 1998), *8-9, quoting 33 Ohio Jurisprudence 3d, Decedent's Estates, Section 1153 (1997). The benefit of an expert's testimony in such cases is to identify what behaviors are associated with dementia and the loss of cognitive function.

{¶ 74} Dr. Sherman was qualified as an expert in the field of psychiatry and was competent to testify in this case. Both he and Dr. McSweeny testified that postmortem

33.

competency evaluations are generally accepted in the field of psychology and psychiatry. Dr. Sherman testified that while he did not accept the opinions of lay person as to competency, he did accept their observations of Flowers' cognitive abilities, which he was able to relate to her mental capacity because of his expertise. The foundation for his opinion that Flowers lacked testamentary capacity was that if she was unable to make judgments of a certain level in certain matters, it was reasonably certain she also would have lacked the capability to make judgments related to testamentary capacity. Therefore, we find Dr. Sherman's opinion was relevant to the issue of Flowers' testamentary capacity. Appellants' second assignment of error is found not well-taken.

{¶ 75} **Third Assignment of Error.** Appellants argue that Dr. Rasor's opinion as to Flowers' testamentary capacity should have been excluded from evidence because he was not qualified to give it and his opinion lacked a proper foundation. They argue Dr. Rasor had no expertise in the issue of contractual or legal capacity, neurology, psychiatry, psychology, organic brain disorders, never assessed Flowers for the cause of her memory loss, never diagnosed her with dementia, and had referred Flowers to a neurologist because of his lack of expertise. They further argue that Dr. Rasor's opinion was based solely on the opinion of Dr. Saraiya, and therefore, was hearsay.

{¶ 76} The trial court may, at its discretion, allow a lay person to testify regarding a person's mental state. *Rucker v. State*, 119 Ohio St. 189, 199, 162 N.E. 802 (1928); *Hunt v. Crossroads Psychiatric & Psychological Ctr.*, 8th Dist. Cuyahoga No. 79120, 2001 Ohio App. LEXIS 5388, *10 (Dec. 6, 2001). A physician expert opinion can be

34.

"based on the actual knowledge which the physician has gained by personal contact with, and study of, such person as a patient." *Bahl v. Byal*, 90 Ohio St. 129, 138, 106 N.E. 766 (1914). *See Vetter v. Hampton*, 54 Ohio St.2d 227, 230, 375 N.E.2d 804 (1978); *Weis,* 147 Ohio St. at 422, 72 N.E.2d 245. The physician expert may also rely upon data in medical records, but not another physician's opinion reported in the medical records. Evid.R. 703; *Wells v. Miami Valley Hosp*., 90 Ohio App.3d 840, 858, 631 N.E.2d 642 (2d Dist.1993). The testifying expert must state the underlying facts and data that were the foundation of his opinion and may not simply refer generally to the record which contains the underlying facts he considered. Evid.R. 705; *Stephenson v. Guda*, 4th Dist. Pike No. 532, 1995 Ohio App. LEXIS 1032, *13 (Mar. 15, 1995). Even if a physician testifies as an expert, his expert opinion "as to mental competency is not necessarily conclusive on that question 'as a matter of law.'" *Vetter*.

**{¶ 77}** We find the trial court did not abuse its discretion in allowing the expert opinion testimony of Dr. Rasor to be admitted in this case. We agree with appellants that the mere fact that a witness is a doctor does not necessarily mean they are an expert in all medical fields. Therefore, the expert must set forth their qualifications of expertise as to the determination of mental capacity. In this case, Dr. Rasor testified he examined Flowers in May 2010, prior to when she executed the beneficiary designation. While not a specialist in the field of neurology, etc., he had sufficient medical training to make observations about her general mental functioning in comparison with his observation of patients in his 15-year practice and his familiarity with dementia patients. He also had

35.

the medical expertise to understand the significance of the factual observations of Dr. Saraiya and Dr. Watkins to make an assessment of Flowers' mental capacity. Dr. Rasor testified that he based his opinion on his own examination of Flowers, as well as the observations and notes of Dr. Saraiya and Dr. Watkins. While he did not delineate the underlying facts to a great extent, it is clear that he based his opinion on his finding that Flowers exhibited memory impairment during his examination and also during her examination by Dr. Saraiya and Dr. Watkins. Therefore, we find there was a foundation for Dr. Rasor's opinion. The issues raised by appellants are issues relating to the weight to be given Dr. Rasor's testimony rather than its admissibility. Appellants' third assignment of error is found not well-taken.

{¶ 78} **Fourth Assignment of Error.** Appellants argue the trial court erred in admitting into evidence the opinion of Dr. Watkins pursuant to Evid.R. 702(C). They argue Dr. Watkins conceded that his report on Flowers was methodologically unreliable because the GAF test has since been rejected as too subjective; a low IQ score does not necessarily reflect the lack of testamentary capacity; and Dr. Watkins declined to give an opinion on Flowers' testamentary capacity and actually testified she might have been able to determine to whom to give her money.

{¶ 79} We agree in part. First, Dr. Watkins testified that he could not make an assessment of Flowers' testamentary capacity based upon his report. Although, he did state that while she could not understand a stock portfolio, that incapacity did not necessarily indicate that she could not make a testamentary gift.

36.

{¶ 80} His assessment focused on her level of cognitive function as it related to the four abilities needed to work. While Dr. Watkins testified the GAF is no longer used in social security disability assessments because of its subjectivity, it was an acceptable testing mechanism at the time it was administered and since Dr. Watkins administered the test, he had the ability to recognize the basis for his subjective conclusions. Dr. Watkins, Dr. McSweeny, and Higley indicated on the record that the GAF was unreliable because it is a subjective test. Dr. Sherman testified he primarily considered the IQ score because he was not familiar with Dr. Watkins' tests. We do not find that anyone was misled by the GAF score.

{¶ 81} We also agree that a low IQ score alone does not definitively indicate a lack of testamentary capacity. However, the IQ score is a relevant fact that can be considered in the determination of testamentary capacity. Dr. Watkins' report does provide observable facts upon which Dr. Sherman and Dr. McSweeny could base their opinions. Therefore, we find the trial court did not err in admitting the testimony of Dr. Watkins. The issues asserted by appellants with respect to Dr. Watkins' testimony raise questions of weight rather than admissibility.

{¶ 82} Therefore, we find appellants' fourth assignment of error not well-taken.

### Sufficiency of the Evidence

{¶ 83} **Appellate Standard of Review.** The term "sufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of

37.

law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). This standard is very narrow and tests only whether there was evidence presented which supports each element of the prima facie case. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 11.

{¶ 84} **Burden of Proof of Incapacity**. Changing a beneficiary designation for an annuity is a contractual act. *Schiavoni v. Roy*, 9th Dist. Medina No. 11CA0108-M, 2012-Ohio-4435, ¶ 17; *Davis v. Marshall*, 10th Dist. Franklin No. 94APE02-158, 1994 Ohio App. LEXIS 3538, *6-7 (Aug. 9, 1994) (P.O.D account). A person must be of sound mind to enter into a contract. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, ¶ 16. To prove a contract is voidable on the ground that a party lacked the mental capacity to enter into it, the complaining party must establish the lack of mental capacity by clear and convincing evidence. *Cameron v. State Teachers Retirement Bd.,* 10th Dist. Franklin No. 00AP-425, 2000 Ohio App. LEXIS 5539, *11 (Nov. 30, 2000). Because changing a beneficiary designation under an annuity is similar to naming the heir in a will, the test of testamentary capacity can also be used as a standard for mental capacity to execute a beneficiary designation. *Schiavoni*; *Rogers v. Frayer*, 11th Dist. Geauga No. 94-G-1854, 1995 Ohio App. LEXIS 2677, *10 (June 16, 1995). The test of testamentary capacity is whether the person "has sufficient mind and memory: First, to understand the nature of the business in which he is engaged; Second, to comprehend generally the nature and extent of his property; Third, to hold in his mind the names and identity of those who have natural claims upon his bounty; [and] Fourth, to be able to appreciate his

38.

relation to the members of his family." *Niemes v. Niemes*, 97 Ohio St. 145, 119 N.E. 503 (1917), paragraph four of the syllabus.

{¶ 85} There is also a rebuttable presumption that a person is competent unless they have been legally declared mentally incompetent. *Cameron* at *11; *Buzzard v. Public Employees Retirement Sys. of Ohio*, 139 Ohio App.3d 632, 637, 745 N.E.2d 442, 2000 Ohio App. LEXIS 1950 (10th Dist.2000); *Dover v. Durkoske*, 11th Dist. Lake No. 92-L-067, 1993 Ohio App. LEXIS 3338, *7 (June 30, 1993). Therefore, appellee had the burden to overcome the presumption with clear and convincing evidence.

{¶ 86} Evidence of a lack of testamentary capacity must be relevant to competency on or near the day the testamentary act was made. *In re Estate of Marsh*, 2d Dist. Greene No. 2010 CA 78, 2011-Ohio-5554, ¶ 18, quoting *Bustinduy*, 2d Dist. Champaign No. 98-CA-21, 1998 Ohio App. LEXIS 6047, at *8-9. Evidence of dementia alone is insufficient to establish a lack of testamentary capacity; there must be evidence of how the dementia impacted the person's testamentary capacity. *Boland*, 2015-Ohio-1712, 33 N.E.3d 551 at ¶ 15. Incompetency can be established by an expert witness and also by a law witnesses who observed the mental state of the person and could assess whether, in his opinion, the person was of sound mind to make a testamentary disposition. *Weis*, 147 Ohio St. at paragraph two of the syllabus, 72 N.E.2d 245.

{¶ 87} **Burden of Proof of Undue Influence**. The party claiming undue influence must prove the prima facie elements of the claim: "(1) a susceptible party; (2) another's opportunity to exert [influence]; (3) the fact of improper influence exerted

or attempted; and (4) the result showing the effect of such influence." *West v. Henry*, 173 Ohio St. 498, 510-511, 184 N.E.2d 200 (1962).  No presumption of undue influence is present in this case because Seifer was not named as a beneficiary of the annuity and did not execute the beneficiary designation as Flowers' attorney-in-fact.  *Compare Krischbaum v. Dillon*, 58 Ohio St. 3d 58, 63, 567 N.E.2d 1291 (1991); *Schiavoni v. Roy*, 9th Dist. Medina No. 11CA0108-M, 2012-Ohio-4435, at ¶ 22.

{¶ 88} **Fifth Assignment of Error**:  First, appellants argue, with respect to the issue of Flowers' mental competency, that appellee failed to meet his burden of proof because he presented only the expert opinions of Dr. Rasor, Dr. Watkins, and Dr. Sherman, which related solely to the first element of the *Niemes* test and Dr. Rasor and Dr. Watkins both testified that they did not assess Virginia's testamentary capacity. Appellee did not present any evidence as to the remaining factors to overcome the presumption of competency or to counter the lay opinion evidence of Ruckman or Flowers' own testimony at the CPO hearing.

{¶ 89} We find this argument lacks merit.  We agree that Dr. Watkins did specifically testify that Flowers might have been able to determine to whom she wished to give her money even though she could not manage her finances.  Dr. Rasor and Dr. Sherman, however, both testified that Flowers did not have the mental capacity to execute the beneficiary designation.  Dr. Sherman testified more specifically that she would not have had the mental capacity to understand that she was changing disposition of her assets nor the nature and extent of her assets.  Dr. Sherman further opined that

40.

Flowers would not have been capable of having lucid moments. Therefore, we find there was sufficient evidence to submit this case to the trier of fact.

{¶ 90} Second, with respect to the claim of undue influence, appellants argue that appellee did not meet his burden of proof because there was no evidence that the beneficiary designation change was Siefer's idea.

{¶ 91} The trial court concluded that there was clear and convincing evidence that Siefer exercised undue influence over Flowers because her sudden change in attitude by changing the beneficiary of her account was totally inconsistent with her prior actions. The court found Flowers never wavered in the past from supporting appellee in opposition to her daughters and extended family.

{¶ 92} Upon a review of all of the evidence, we find there was evidence that Flowers was susceptible to influence because of her dementia and that Siefer would have had the opportunity to exert influence over Flowers. While there was no direct evidence that Siefer actually exerted improper influence over Flowers, there was circumstantial evidence from which an inference could be drawn that Siefer did exert undue influence over Flowers. There was evidence Flowers was mentally incompetent, she changed her beneficiary designation after she returned to Ohio, and the change was inconsistent with all of her prior decisions. While there was evidence from Flowers' own testimony that she disliked and was afraid of appellee and that she reported to Dr. Watkins that she had a good relationship with her daughters, appellants' arguments related to the weight of the

41.

evidence, not the sufficiency of the evidence. Therefore, we find there was some evidence admitted which supported every element of appellee's prima facie case.

{¶ 93} Appellants' fifth assignment of error is not well-taken.

**Manifest Weight of the Evidence**

{¶ 94} **Appellate Standard of Review**. A challenge to the weight of the evidence questions whether the greater amount of credible evidence was admitted to support the judgment than not. *Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, at ¶ 17-19; *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. When weighing the evidence, the court of appeals must consider whether the evidence in a case is conflicting or where reasonable minds might differ as to the inferences to be drawn from it, consider the weight of the evidence, and consider the credibility of the witnesses to determine if "the jury clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3, 461 N.E.2d 1273 (1984) (citation omitted).

{¶ 95} **Sixth Assignment of Error:** Appellants argue that the probate court lost its way in evaluating the evidence of Flowers' competency because the court did not give any weight to the evidence that the police did not force Flowers to return to appellee, the

42.

magistrate at the civil protection hearing granted her request for a civil protection order, and several lawyers, the account representative, and a psychiatrist (McSweeny) testified Flowers was mentally competent in July 2010. Furthermore, they argue the probate court overlooked Flowers' own sworn testimony that she was afraid of appellee and believed he was taking all her money. As to the issue of undue influence, appellants argue that the trial court erred in failing to consider that Flowers desired to leave appellee in April 2010, and that it was the unraveling of their relationship that led to her decision to change her beneficiary designation rather than undue influence.

{¶ 96} In this case, conflicting evidence was presented as to Flowers' testamentary capacity and there was a difference of opinion as to the weight to be given lay and expert witness evidence. The probate court, as the trier of fact, resolved these conflicts. We cannot say that the court lost its way in resolving these conflicts and created such a manifest miscarriage of justice that its judgment should be reversed. Appellants' sixth assignment of error is found not well-taken.

**Motion for New Trial**

{¶ 97} **Appellate Standard of Review.** Where the ruling on a motion for a new trial is based on ground which involves the exercise of the trial court's discretion, the appellate court applies an abuse of discretion standard of review; however, where the ground for granting a new trial involves a question of law, the ruling is reviewed de novo. *Rohde v. Farmer*, 23 Ohio St.2d 82, 262 N.E.2d 685 (1970), paragraph one of the

43.

syllabus; *O'Day v. Webb*, 29 Ohio St.2d 215, 216, 280 N.E.2d 896 (1972), paragraph one of the syllabus.

{¶ 98} **Seventh Assignment of Error**.  In appellants' motion for new trial, they did not specifically indicate the Civ.R. 59(A) grounds for their motion.  However, we have classified their arguments as follows.  Appellants argue the trial court admitted the testimonial evidence of experts (Drs. Rasor and Watkins) that was beyond their expertise and irrelevant to the issue of testamentary capacity, Civ.R. 59(A)(1); the trial court ignored the testimony of lay witnesses and considered the unreliable testimony of Dr. Sherman during its deliberations and rendered a judgment which was contrary to the manifest weight of the evidence, Civ.R. 59(A)(6); and the trial court erred as a matter of law in considering the case when insufficient evidence was presented to support the prima facie elements of appellee's claim, Civ.R. 59(A)(9).  The first two grounds involve the exercise of the probate court's discretion to determine if a new trial is warranted. *Wolf v. Interstate Wrecker Serv.*, 8th Dist. Cuyahoga No. 97144, 2012-Ohio-1744, ¶ 17; *Mannion v. Sandel*, 91 Ohio St.3d 318, 322, 744 N.E.2d 759 (2001).  The last ground is a question of law.  *Pangle v. Joyce*, 76 Ohio St.3d 389, 395, 667 N.E.2d 1202 (1996); *Sanders v. Mt. Sinai Hosp.*, 21 Ohio App.3d 249, 252, 487 N.E.2d 588 (8th Dist.1985).

{¶ 99} We have already discussed the merits of these grounds in consideration of the prior assignments of error.  Therefore, we find that the trial court did not abuse its discretion or err as a matter of law in denying appellants' motion for a new trial.  Appellants' seventh assignment of error is not well-taken.

44.

**{¶ 100}** Having found the trial court did not commit error prejudicial to appellants and that substantial justice has been done, the judgment of the Lucas County Court of Common Pleas, Probate Division, is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                                  _____

                                                       JUDGE

Thomas J. Osowik, J.

                                     _____

James D. Jensen, P.J.                                            JUDGE
CONCUR.

                                     _____

                                                         JUDGE

45.