Robb, P.J.
{¶ 1} Plaintiffs-Appellants/Conditional Cross-Appellees Stephen Krutowsky, Thomas Bartlebaugh, and KB Resources, LLC (collectively referred to as Appellants) appeal the jury verdict entered in Columbiana County Common Pleas Court in favor of Defendants-Appellees/Conditional Cross-Appellants Patriot Energy Partners, LLC, William Hlavin, and Andrew Blocksom (collectively referred to as *732 Appellees). Appellants also appeal the trial court's decision denying their motion for judgment notwithstanding the verdict and, in the alternative, motion for new trial. They assert the jury's verdict was against the manifest weight of the evidence and the verdict was contrary to law. They focus on the jury's finding that Appellants and Appellees entered into an agreement for Appellants to be bought out of Patriot in November 2009. They assert the evidence and the law require a finding that the agreement was entered in May 2010 when the contract was signed. Appellants also argue the trial court erred by giving an instruction on laches. In a jury interrogatory, the jury indicated Appellants waited an unreasonable amount of time to file suit against Appellees.
{¶ 2} Appellees filed a conditional cross appeal. Appellees argue the trial court abused its discretion when it allowed the opinion of expert Robert Brlas on damages and the trial court erred when it did not grant Appellees motion for directed verdict on damages. They assert Brlas' opinion is based on speculation.
{¶ 3} For the reasons expressed below, the jury's verdict is affirmed and the trial court's decision regarding the motions for a new trial and JNOV are also affirmed. The conditional appeal is moot.
Statement of the Facts and Case
{¶ 4} In June 2008, Appellees Hlavin and Blocksom, and Defendant Robert Dickey approached Appellants Krutowsky and Bartlebaugh about forming a company, Patriot Energy Partners LCC., to enter into leases in Carroll, Columbiana, Harrison, and Jefferson counties. Tr. 467, 1495. Appellee Hlavin is a geologist and from his knowledge and research, and the research of others, he believed prolific deep oil and gas deposits might be found along the Highlandtown Fault, a geological feature that runs from the Ohio River and goes through the southern Columbiana/northern Carroll County borders. Tr. 835, 1124, 1134-1136. The existence of the Highlandtown Fault has been well documented through coal mining. Tr. 1135. The fault has perpendicular smaller faults off to the side, which would be another area that's "prolific for the entrapment of oil and natural gas." Tr. 1136. The belief was Marcellus shale would be found along the fault and the amount and depth of the shale would be similar to what was found in West Virginia, Pennsylvania, and New York. Tr. 1134. Marcellus shale found in those areas was about 4,000 to 7,200 feet below the surface and was usually about 50 to 150 feet thick. Tr. 1133. Thus, this lease play would be primarily for deep drilling rights. After the leases were acquired, they would be sold at a profit.
{¶ 5} At the June 2008 meeting it was explained, Appellee Blocksom and Defendant Dickey would be the land men, which means they would be the ones contacting landowners and buying leases. Tr. 472-473, 1367. They would attempt to purchase leases to 30,000 acres around the Highlandtown Fault in Carroll, Columbiana, Harrison, and Jefferson counties. Tr. 835, 1367. Appellants Bartlebaugh and Krutowsky were asked to invest capital in the venture, specifically $700,000. Tr. 472, 820, 1495.
{¶ 6} The business venture was described as a short term deal. Appellants Bartlebaugh and Krutowsky believed it would only last one year. Tr. 471, 1498. They also believed the deal included keeping some locations to drill shallow wells. Tr. 1496, 2061. Appellees stated it was a short term deal, but there was no indication it would only be a term of one year. Tr. 819.
{¶ 7} At the meeting, delay rentals for the second year were discussed. It was stated delay rentals would be paid out of *733 profits before distribution. Tr. 827. Appellants believed the delay rentals would be paid from shallow drilling, since Hlavin in the past had made money from shallow drilling. Tr. 472, 480. Blocksom indicated this was an incorrect belief because the drilling process, even for shallow wells, takes longer than a year to be profitable, and thus, the delay rentals would already be due on many of the leases where no drilling was occurring. Tr. 2062. Blocksom also stated drilling, even shallow wells, was expensive. Tr. 2063.
{¶ 8} Appellants Bartlebaugh and Krutowsky agreed to the business deal. Appellee Patriot Energy Partners, LLC was then formed. The operating agreement of Patriot Energy became effective June 30, 2008. Plaintiff's Exhibit 11. There were two members of the LLC - KB Resources, LLC and PEP Leasing LLC. Plaintiff's Exhibit 11, Operating Agreement. KB Resources was owned by Appellants Krutowsky and Bartlebaugh. Tr. 486. PEP Leasing was owned by Hlavin, Blocksom, and Dickey. Tr. 491, 858, 1161. The following portions of the operating agreement are relevant to the issues raised in this case.
{¶ 9} The agreement indicated the initial capital contribution of PEP Leasing LLC would be $60,000 and the initial capital contribution of KB Resources would be roughly $700,000. Tr. 489, 831, 1162; Plaintiff's Exhibit 11, Operating Agreement, Section 6, Exhibit A. No member was obligated to make additional capital contributions. Tr. 489, 831, 1162, 1512; Plaintiff's Exhibit 11, Operating Agreement, Section 6. Bartlebaugh took this provision to mean he would not have to pay delay rentals. Tr. 489.
{¶ 10} The agreement provided additional contributions could be made with the prior approval of the Management Committee and made in cash or in kind at a valuation to be determined by the Membership Committee. Tr. 490, 832; Plaintiff's Exhibit 11, Operating Agreement, Section 6. The agreement indicated the membership committee consists of Andrew Blocksom, who is the president of Patriot Energy, three persons to be named by PEP Leasing, and one person to be named by KB Resources. Blocksom testified he does not remember forming a membership committee. Tr. 830. He further explained he was named president, but no other officers were named. Tr. 830.
{¶ 11} As to profit, the operating agreement provided before any profits would be paid out, the members contributing capital in cash or in-kind would be fully repaid with no interest. Plaintiff's Exhibit 11, Operating Agreement, Section 7.1. The operating agreement also indicated oil and gas leases shall be subject to a 6% override if sold to a third party. Tr. 492, 833, 1163; Plaintiff's Exhibit 11, Operating Agreement, Section 7.1. That 6% would be divided between KB Resources LLC and PEP Leasing, LLC with 2% to KB Resources and 4% to PEP Leasing LLC. Tr. 492, 833, 1163; Plaintiff's Exhibit 11, Operating Agreement, Section 7.1. KB Resources, however, was entitled to a priority override. Tr. 492, 833, 1163; Plaintiff's Exhibit 11, Operating Agreement, Section 7.1. Thus, if the leases could not be sold with a full 6% override, KB Resources LLC would be entitled to its 2% override before anyone else would collect their royalty.
{¶ 12} The agreement also dictated the process to use when a member sells any or all of its interest to a person other than a member. Tr. 1256-1260; Plaintiff's Exhibit 11, Operating Agreement, Section 9.2.
{¶ 13} Appellee Blocksom and Defendant Dickey, acting as land men, purchased leases to 40,000 acres for Patriot Energy; the members agreed for the acreage to be increased from 30,000 to 40,000. Tr. 1166. Appellants raised approximately *734 $730,000, which was used to purchase the leases and pay costs. Tr. 489, 495, 838, 1164, 1528. They raised money by borrowing money from friends, family and other businesses Appellant Krutowsky owned. Tr. 466, 471, 481. Appellants Krutowsky and Bartlebaugh personally guaranteed the loans. Tr. 481-483, 660. The loans were all for one year; there was a possible 6 month extension at an interest rate of 4.16% per month. Tr. 486-487, 659; Plaintiff's Exhibit 9. After one year the lender was entitled to a minimum return of 10% simple interest. Tr. 487, 659-660; Plaintiff's Exhibit 9.
{¶ 14} In December 2008, Patriot Energy met with one of its first potential buyers, CTL Capital LLC, which is a financial company located in New York City. Tr. 1171, 1530, 2181 Paul Penney Depo. 9. This potential buyer was brought in by Krutowsky. In December 2008, there was a meeting between Paul Penney, an investment banker, from CTL Capital, Darrell Kelsoe, Appellants, and Appellees. Tr. 512, 843-844, 1171, 2079, 2181; Paul Penney Depo. 23, 30. CTL offered Patriot Energy $8 million for the leases and retention of the exclusive right to invest in up to 25% of a working interest of an exploratory well constructed by the buyer, CTL. Tr. 690, 859, 860, 2181; Paul Penney Depo. 56-57, 66. The exploratory well/proposed drilling program was for 50 wells over a five year period that would cost approximately $62,000,000. Tr. 858, 1171. Hlavin, Blocksom, Bartlebaugh, and Krutowsky were not interested in this proposal because of the drilling program, and thus, the offer was not pursued. Tr. 681, 860, 1172, 1542-1545, 2181; Paul Penney Depo. 132.
{¶ 15} During this negotiation an email was sent from Penney to Kelsoe and Krutowsky stating Patriot Energy is worth 15 million and they (Penney, Kelsoe, and Krutowsky) should buy the company for 8 million and then sell 75% of the company for $9 million. Tr. 686-687, 2181 Defendant's Exhibit E; Paul Penney Depo. 37-39. Krutowsky did not tell his partners about this email. Tr. 1652.
{¶ 16} In May 2009, the CTL Capital offer was reduced to $1.8 million. Tr. 694, 862, 2099, 2181 Paul Penney Depo. 82. That offer was signed by everyone, but it never materialized. Tr. 697-698, 862-863, 2099, 2165-2166, 2181; Paul Penney Depo. 92. Paul Penney testified it did not materialize because the capital did not come through and thus, there was no definitive purchase and sale agreement entered into. Tr. 2181; Paul Penney Depo. 95, 103.
{¶ 17} In early 2009, Hlavin began having discussions with another company, Anschutz, about buying the Patriot Energy leases. Tr. 1172. One of the meetings included Krutowsky, Bartlebaugh, and Blocksom. Tr. 1173, 1552, 2087. At that time Anschutz indicated it was interested in drilling some deep test wells around the Patriot Energy acreage; Krutowsky acknowledged he was told at this meeting Anschutz planned to drill in this area. Tr. 1677, 2087. The representative from Anschutz offered $50 to $75 per acre. Tr. 2088. Blocksom testified Krutowsky responded that the acreage is worth $350 per acre; Krutowsky denied saying that. Tr. 1680, 2088. Blocksom testified Bartlebaugh's response to the Anschutz offer was, "If we were to take her offer at the low number, which is an average of let's say, $50 an acre that we would barely get our money back, and we wouldn't be interested in doing a deal at those numbers." Tr. 2089. In March 2009, Blocksom received an email from Anschutz indicating they no longer had any interest in the Patriot Energy leases. Tr. 2095. However, Anschutz re-approached Hlavin in the fall of 2009 renewing its interest in purchasing the Patriot Energy leases. Tr. 1183.
*735 {¶ 18} In April and May delay rentals on the first leases purchased by Patriot Energy were due; many of the leases were for only one year. Tr. 516, 864, 1180-1181. If the delay rentals were not paid the leases would expire and Patriot Energy would lose part of the product it was trying to sell. Blocksom emailed a spreadsheet of a list of rentals due to Krutowsky, Bartlebaugh, and Hlavin in May 2009; the email indicated roughly $133,000 in delay rentals were due. Tr. 518, 866-867, 1180-1181, 1560. The list did not contain a formal request to pay the delay rentals; Bartlebaugh and Krutowsky did not view this email as a request for money. Tr. 518, 869, 1181, 1561. However, within a week of that e-mail Hlavin, through Bass Energy, injected $100,000 into Patriot Energy to pay for the delay rentals. Tr. 872-873, 1182, 2101. Rentals were paid with that money; however, Blocksom did not notify Appellants that money had been injected into Patriot Energy from Hlavin and that money had been used to pay delay rentals. Tr. 518, 521, 873-874, 880. In July 2009, Blocksom sent another email to Hlavin, Krutowsky, and Bartlebaugh indicating there were $75,000 in delay rentals due and they were in the process of losing leases for failing to pay delay rentals. Tr. 524, 876, 1565-1566, 2102.
{¶ 19} Hlavin acknowledged the goal was to try to save the leases along the Highlandtown Fault; therefore, this was the area where the delay rentals were paid. Tr. 1183. Blocksom indicated 60% of their leases were around the Highlandtown Fault and those were the delay rentals due at the time. Tr. 882-883. He also acknowledged the operating agreement dictated how additional contributions would be made, but he indicated they ran the business very informally so they did not follow those provisions of the agreement. Tr. 832, 2072-2074.
{¶ 20} In November 2009, Krutowsky and Bartlebaugh asked Blocksom and Dickey to come to their office for a meeting. Tr. 885, 1375, 1572. A tape of the November 2009 meeting was played for the jury. Tr. 528-545; Plaintiff's Exhibit 49. The meeting was solely about the Patriot Energy leases. During this meeting, Blocksom did not say they preserved some of the leases with the funds injected from Hlavin. Tr. 549-550, 886.
{¶ 21} At the meeting, Krutowsky indicated their investors wanted their money back; Krutowsky said there were emails and calls demanding money back. Plaintiff's Exhibit 49; Tr. 2113. Blocksom stated he believed Krutowsky and Bartlebaugh when they told him investors wanted their money back. Tr. 2114. Bartlebaugh admitted there were no emails demanding money back. Furthermore, two investors, Dr. Moyal and Marshall Goldman, testified at the trial and confirmed they did not ask for their money back. Tr. 2053; Dr. Moyal Depo. 53; Tr. 2177; Marshall Goldman Depo 27-29.
{¶ 22} Testimony concerning this November 2009 meeting indicated Appellees believed Appellants were threatening to sue them if they did not get their investment back. Tr. 884, 885, 1090, 1306, 1377-1378, 2115. In addition to threatening a lawsuit, Appellees also believed the statements made by Appellants at this meeting indicated they wanted to be bought out of Patriot Energy, i.e., they wanted "out of the deal." Tr. 890, 907, 912, 914, 1203, 1378.
{¶ 23} Attorney Dowling from Buckingham, Doolittle & Burroughs testified it was explicable why Appellants were searching for money at this time. Tr. 1784. His client, Diplomate, had sued Krutowsky and Bartlebaugh and the jury had just rendered a $2.25 million verdict in Diplomate's favor; Krutowsky and Bartlebaugh were personally *736 responsible for that amount. Tr. 1783. Krutowsky and Bartlebaugh denied that they needed money to pay the verdict.
{¶ 24} Allegedly around the time of the November 2009 meeting there had been a fall in the market for the pricing of acreage for drilling and there was not much interest in the market for the Patriot Energy leased acreage. Tr. 889. Potentially this was because geologically it was discovered that the Marcellus shale thinned out in Ohio; Marcellus shale was thick in Pennsylvania and New York. Tr. 1190. Furthermore, Utica shale was not discovered in the area of the Patriot leases until the first half of January 2010.
{¶ 25} In January 2010, Anschutz had a 3D seismic performed in Carroll County over a location where they were going to drill a well. Tr. 995. Gerry Jacobs, owner of American Energy Services, Inc. and who was presented at trial as an oil and gas man, explained that doing a seismic was not significant to him because "people do seismic all over the county" and in many occasions, they just do it and walk away. Tr. 996.
{¶ 26} Following the seismic, Anschutz built a deep well in the area of the Patriot Energy leases; they drilled to 9000 feet and cored 124 feet of Utica shale. Tr. 565, 1032. Hlavin knew of the Anschutz drilling in January 2010, but claims he never knew that Anschutz cored 124 feet of Utica shale. Tr. 1188, 1213. Bartlebaugh and Krutowsky testified they were never told Anschutz had drilled a well. Tr. 565, 1558. However, it was in the local newspaper and Hlavin claimed he gave Appellants the February 8, 2010 article from the Carroll County Free Press Standard reporting Anschutz was drilling a deep well in Carroll County. Tr. 1223. Bartlebaugh denied he was given the article. Tr. 565.
{¶ 27} Kevin Norris, CEO of 1st NRG, testified that as of March 15, 2010 the price per acreage in Ohio was escalating rapidly due to the Anschutz discovery of the abundance of Utica shale. Tr. 1957 and 1986 Kevin Norris Depo. 26-27. He indicated the Anschutz well and discovery was public information at that time and he knew from that information this area was "hot play." Tr. 1957 and 1986 Kevin Norris Depo 71-72.
{¶ 28} Following the November 2009 meeting and the Anschutz drilling, Hlavin and Blocksom continued to look for buyers for the Patriot Energy leases. Gerry Jacobs and his company American Energy Services, Inc. (AES), was a potential buyer in January 2010. Tr. 982, 1198. Jacobs had a genuine interest in the Patriot Energy leases and Jacobs made an offer to Hlavin for the project. Tr. 1008. AES wanted an exclusive 90-day option to buy the project for $8.3 million. Tr. 1009-1010. However, AES offered no money for the option. Tr. 1010. Hlavin told Jacobs, he showed the offer to his partners, Krutowsky, Bartlebaugh, and Blocksom, and would not have an answer for 30 days. Tr. 1021-1022, 1024. Hlavin, however, did not tell Krutowsky, Bartlebaugh, or Blocksom about the offer. Tr. 566, 904. Jacobs indicated he offered nothing for the exclusive 90-day offer, which was probably why it was rejected by Hlavin. Tr. 1095. Hlavin confirmed that belief and indicated he threw the offer out the same day he received it and did not tell the others about the offer; he indicated the offer was somewhere between a joke and an insult. Tr. 1201. He explained he did not consider it a viable offer because Patriot Energy needed money to pay delay rentals and a 90-day exclusive option without a payment for that option would not help Patriot Energy pay the delay rentals and retain the leases. Tr. 1201. Even though Blocksom did not know about this offer at the time it was made and rejected by Hlavin, he agreed it was not a viable offer *737 because Patriot Energy's leases were not paid. Tr. 905.
{¶ 29} In March 2010, 1st NRG offered $850,000 for 40% interest of Patriot Energy and to pay $320,000 in delay rentals. Tr. 1235-1236, 1244, 2119; Tr. 1957 and 1986 Kevin Norris Depo. 15, 20-21. Hlavin did not tell Appellants about the 1st NRG offer. Tr. 570, 1236, 1245, 1608. Blocksom indicated he was talking to 1st NRG because he was trying to get Bartlebaugh and Krutowsky's money back to them since they wanted to be bought out of Patriot Energy. Tr. 2119. Blocksom stated around this time many of leases were going to expire and it was "bad." Tr. 2120.
{¶ 30} On April 15, 2010, Anschutz offered $75 an acre for the Patriot Energy leases. Tr. 1261; Plaintiff's Exhibit 110. Anschutz revised that offer two weeks later, but still offered $75 an acre, which was the same offer made in early 2009. Tr. 1262-1263, 2124; Plaintiff's Exhibit 117. Hlavin did not tell Appellants about the 2010 offers. Tr. 1261, 1263, 1611.
{¶ 31} In May 2010, Kenyon Energy also made offers for the Patriot Energy leases. Tr. 916, 1267. Kenyon Energy offered $125 an acre, a 3.125% royalty and a $350,000 nonrefundable down payment. Tr. 919-920, 923, 1267. Appellants were not told of this offer. Tr. 1276. Blocksom did not think Kenyon was a viable buyer. Tr. 929. Later he learned Kenyon worked exclusively for Chesapeake and Chesapeake was behind the offer. Tr. 929.
{¶ 32} Blocksom indicated he did not tell Appellants about the offers following the November 2009 meeting because he would not be able to act upon the offers because the leases were expiring or had expired. Tr. 915. He explained:
Again, all - what I was trying to do at that time was keep about, I don't know, 40,000 plates in the air of leases that were expired, people that wouldn't pay the bills, and my goal was to try to get - at that point, when they were wanting out, my point was to try and get the lease paid and I had people that wouldn't put the money in to pay them, so I really didn't have anything to be able to sell. So all the discussions that I'm having with those people weren't something I could actually warrant.
Tr. 893.
{¶ 33} He further indicated companies were offering him money for the leases in March/April 2010, but those companies wanted assurances the leases were paid in full. Tr. 2128. Blocksom could not warrant that because many leases were not paid and therefore, he could not sign a deal for the sale of the leases that required him to warrant the leases in exchange for a nonrefundable deposit. Tr. 2128, 2156.
{¶ 34} In early 2010 through spring of 2010 many of the Patriot Energy leases were ripe for top leasing. Tr. 894, 2128-2129. Top-leasing happens when rentals are not paid on time. Tr. 997, 1114. Other companies can approach the landowner to lease the property. Tr. 997, 1114. If the current leaseholder does not pay the delay rentals within a certain period of time, the original lease is in default and the lease of the second leaseholder becomes paramount. Tr. 997, 1115. Jacobs testified in January 2010, Hlavin was worried about other companies "top-leasing" him. Tr. 997. Blocksom was worried about top leasing in late 2009. Tr. 894. If the leases were top leased, Patriot Energy would have nothing to sell.
{¶ 35} Hlavin also indicated Appellants were not told of the offers after November 2009 because he believed Appellants were "out of the deal." Tr. 1276. Blocksom echoed that sentiment, "At this time - at this time, which would have been February, I thought they were out. They had moved *738 on. They turned it over to Bill [Hlavin]. We're trying to figure out what we can do to sell the leases. I thought they were out." Tr. 896.
{¶ 36} Following the November 2009 meeting, Hlavin injected money into Patriot Energy to save expiring leases. On February 1, 2010, Bass Energy, Hlavin's company, injected $15,560 into Patriot to pay leases. Tr. 573, 909. On May 10, 2010, Bass Energy, Hlavin's company, put an additional $150,000 into Patriot to pay delay rentals. Tr. 1282. Appellants were not told of the insertion of capital. Tr. 1283. Gerry Jacobs talked to Hlavin regularly during this period and indicated Hlavin was frustrated because Patriot Energy was about to lose thousands of acres if they did not pay the delay rentals, there was no money in the company to pay the delay rentals, and his partners were not putting any money in to pay the delay rentals. Tr. 1091-1092. Therefore, Hlavin had to put the money in to save the leases and keep the business opportunity viable. Tr. 1091-1092.
{¶ 37} In February 2010, Appellants agreed to sell their interest in Patriot Energy for $850,000. Tr. 765, 1732, 2131. Blocksom indicated that amount was not broken down into a per acreage price; rather it was just the amount of money Bartlebaugh and Krutowsky were demanding. Tr. 2131. Hlavin met with Bartlebaugh and/or Krutowsky a few times after the November 2009 meeting; two meetings occurred in February 2010. It was at this second meeting that Hlavin, Bartlebaugh, and Krutowsky verbally agreed to $850,000 for Appellants' interest in Patriot Energy to be bought by a third party; there was no agreement to $850,000 at the November 2009 meeting or the first February 2010 meeting. Tr. 557, 572-573, 585-586, 1601, 1733. Krutowsky further stated this agreement for the $850,000 was not a purchase agreement, but was rather an agreement to get their investment back. Tr. 1601. Appellants received a $150,000 payment on March 1, 2010. Hlavin claimed this money was paid so Appellants could pay Dr. Moyal, a lender, his money back. Tr. 1121. Hlavin indicated he told Appellants he was trying to find a buyer for the rest of their interest. Tr. 1222. On March 22, 2010, Hlavin paid KB Resources another $150,000. Tr. 596, 1222. Hlavin contended this amount was to buy out another lender, Marshall Goldman and his son. Tr. 1222.
{¶ 38} The buyout agreement was not signed until May 13, 2010. Tr. 605. The agreement states, "Whereas, Buyer has agreed to purchase, and Seller has agreed to sell, all of Seller's 40% ownership interest in Patriot, including any rights to any Overriding Royalties, for a purchase price of $850,000; and Whereas, by this Agreement, Seller and Buyer proposes to memorialize their previous oral agreements reading this transaction, including acknowledging the $300,000 that Buyer already has paid to sell toward the purchase price." Tr. 1313-1314; Plaintiff's Exhibit 159.
{¶ 39} Buckeye Oil Producing was the purchaser for the remainder of KB Resources' interest in Patriot Energy. In May 2010, Hlavin, Dickey, and Blocksom met with Buckeye Oil to negotiate Buckeye Oil buying the remainder of KB Resources' interest in Patriot Energy. Tr. 1793. Buckeye Oil paid $550,000 for KB Resources interest; and $250,000 for delay rentals. Tr. 1797. Buckeye Oil received a 26% interest in Patriot and a 1/32 override. Tr. 1797. Buckeye Oil had to inject $80,000 into Patriot Energy a couple months after it purchased the interest to pay more delay rentals. Tr. 1868. Buckeye Oil reiterated that the Patriot Energy leases could not have been sold if the delay rentals *739 were not current, which is why it injected the money. Tr. 1874.
{¶ 40} The CEO from Buckeye Oil explained that when Hlavin approached Buckeye Oil about acquiring a percentage of Patriot Energy, Hlavin was in a hurry because the leases were expiring for nonpayment and Hlavin did not want to put any more money into the project because Hlavin was not sure how long it would take to sell the leases. Tr. 1860. Hlavin was very upfront with Buckeye Oil about the delay rentals not being paid. Tr. 1861. Buckeye Oil viewed this deal as extremely risky and the decision to invest in Patriot Energy was not a unanimous vote from the board. Tr. 1864-1865.
{¶ 41} At the time Buckeye Oil was purchasing the interest in Patriot Energy, Kenyon had made offers on the Patriot Energy leases. The CEO from Buckeye Oil did not think Kenyon was a viable purchaser. Tr. 1799. He knew Kenyon was a "flipper" and unless there was a written signed contract any numbers Kenyon offered did not mean a thing. Tr. 1799.
{¶ 42} In September 2010, after many negotiations, Chesapeake Exploration purchased the deep rights to the Patriot Energy leases for $1,100.00 per acre and a 4.25% overriding royalty. Tr. 1284-1286. Testimony indicated after Patriot Energy sold its leases for $1,100.00 an acre the price skyrocketed to $6,000 to $7,000 an acre. Tr. 1919. Patriot Energy did not the sell the entire 40,000 acres they had previously acquired because they lost about 12,500 for failing to pay delay rentals and top leasing. Tr. 2133-2134. The royalty was divided 1% to Bass Energy, 1% to Blocksom's group, 1% to Dickey's group, 1% to Buckeye Oil, and 0.25% to Jacobs. Tr. 1286-1287. Hlavin then sold approximately half of his royalties to Gateway Royalty. Tr. 1188. He indicated in total he received approximately $11 million dollars from the lease play. Tr. 1289. Similarly, Buckeye Oil received over $8 million from the Chesapeake transaction and another $3 million when it sold half its royalties to Gateway Royalty. Tr. 1909-1910, 1916.
{¶ 43} Even before the Patriot Energy leases were sold, Appellants contacted their attorney and on August 9, 2010 a letter was sent to Appellees indicating Appellants felt defrauded. Tr. 1290-1292. Marshall Goldman testified Krutowsky told him he felt cheated. Tr. 2177 Marshall Goldman Depo. 35.
{¶ 44} Appellees' attorney from Buckingham, Doolittle & Burroughs responded to the letter with an August 16, 2010 letter indicating Appellants were aware of the value of the Patriot Energy leases during the term of their ownership and they were kept apprised of the negotiations for the sale of the leases. Tr. 1293-1294.
{¶ 45} Appellants did not immediately file suit against Appellants; Krutowsky and Bartlebaugh testified they relied on this letter from the attorney because it was from a reputable law firm. Tr. 613, 1616, 1618, 1745-1747. Instead Appellants waited almost four years after the letter and sale of the Patriot Energy leases to sue Appellees.
{¶ 46} In July of 2014 Appellants filed a complaint against Patriot Energy Partners LLC, PEP Leasing LLC, Bass Energy Inc., William Hlavin, Andrew Blocksom, Sonata Investment Co., LTD., Wimsatt Family, LLC, LMI Holdings LLC, Benjamin Dickey, Robert Dickey, Buckeye Oil Producing Co., Mark Lytle, Thomas Blocksom, Harva Blocksom, Trustee of Andrew Sub-P Trust A.W. and S.L Irrevocable Trust; Ted Matthew Doyle, Trustee of P.B.B. Irrevocable Trust; Benjamin Dickey, Trustee of Benjamin R. Dickey Revocable Trust; and John Does. 7/15/14 Complaint; 2/12/15 Amended Complaint. The *740 allegations in the complaint were breach of contract, implied contract, promissory estoppel, unjust enrichment, fraudulent inducement to contract, fraud, fraudulent conveyance, civil conspiracy, negligent misrepresentation, rescission, declaratory judgment, breach of fiduciary duty, piercing the corporate veil, and accounting. 7/15/14 Complaint; 2/12/15 Amended Complaint.
{¶ 47} Appellees filed an answer and counterclaim. 3/5/15 Answer and Counterclaim. They asserted the November 2009 conversation was an enforceable oral agreement for Appellants to sell their interest in Patriot Energy for $850,000. 3/5/15 Answer and Counterclaim. They counterclaimed for breach of contract. 3/5/15 Answer and Counterclaim. Appellees also filed a motion to strike insufficient claims. 2/27/15 Motion. Appellants filed a motion in opposition. 3/30/15.
{¶ 48} Appellants filed an answer to the counterclaim. 4/2/15 Plaintiff Reply to Counterclaim.
{¶ 49} In August 2015, the trial court issued an order striking certain claims and ordered Appellants to file a pleading complying with the order within 14 days. 8/17/15 J.E. On September 3, 2015, Appellants filed their second amended complaint. 9/3/15 Second Amended Complaint. This complaint asserted breach of contract, implied contract, promissory estoppel, and unjust enrichment against Patriot, Hlavin, and Blocksom. 9/3/15 Second Amended Complaint. The complaint also asserted fraudulent inducement of a contract, fraud, civil conspiracy, negligent misrepresentation, rescission, breach of fiduciary duty, and piercing the corporate veil against Patriot, PEP, Bass, Hlavin, Blocksom, Sonata, Wimsatt, LMI, Benjamin Dickey, Bob Dickey, and John Does. 9/3/15 Second Amended Complaint. Fraudulent conveyance was asserted against all defendants. 9/3/15 Second Amended Complaint. Also, Appellants asked for a declaratory judgment. 9/3/15 Second Amended Complaint.
{¶ 50} Appellees filed an answer to the second amended complaint asserting the defense of laches and also counterclaimed alleging breach of contract and unjust enrichment. 9/14/15 Answer to Second Amended Complaint.
{¶ 51} The case proceeded through extensive discovery. Appellees filed a summary judgment motion and Appellants opposed the motion. 4/15/16 Motion for Summary Judgment; 5/10/16 Motion in Opposition to Summary Judgment.
{¶ 52} The trial court granted summary judgment in part. On the breach of contract claim, the trial court granted summary judgment to Hlavin and Blocksom, but allowed the claim to proceed against Patriot Energy. 9/2/16 Order. The implied contract claim was withdrawn. The promissory estoppel claim against Patriot Energy, Hlavin, and Blocksom survived summary judgment. The unjust enrichment claim against Patriot Energy, Hlavin and Blocksom survived summary judgment. The fraudulent inducement to contract claim against Patriot Energy, PEP Leasing, Bass Energy, Hlavin, and Blocksom survived summary judgment. All other defendants against whom this claim was asserted were granted summary judgment on this claim. The fraud claim against Patriot Energy, PEP Leasing, Bass Energy, Hlavin, and Blocksom survived summary judgment. The fraudulent conveyance claim against Patriot Energy, PEP Leasing, Bass Energy, Hlavin, and Blocksom survived summary judgment. The civil conspiracy claim against Patriot Energy, PEP Leasing, Bass Energy, Hlavin, and Blocksom survived summary judgment. The negligent misrepresentation claim against Patriot Energy, PEP Leasing, Bass Energy, Hlavin, and Blocksom survived summary *741 judgment. Summary judgment was granted to all Appellees on the rescission and declaratory judgment claims. The breach of fiduciary duty claim against Patriot Energy, PEP Leasing, Bass Energy, Hlavin, and Blocksom survived summary judgment. The piercing the corporate veil claim against Patriot Energy, PEP Leasing, Bass Energy, Hlavin, and Blocksom survived summary judgment. The accounting claim against Patriot Energy, PEP Leasing, Bass Energy, Hlavin, and Blocksom survived summary judgment. 9/2/16 Order.
{¶ 53} The case proceeded to trial. Following Appellants' case in chief, a directed verdict was granted for Blocksom on promissory estoppel and unjust enrichment claims. Tr. 2036, 2044. At that time, the trial court also dismissed the negligent misrepresentation claim as it pertained to Bob Dickey. Tr. 2046-2051.
{¶ 54} Numerous interrogatories were submitted to the jury; there were multiple interrogatories for many of the claims. Two of the interrogatories are at issue in this appeal. The first is interrogatory number 12. The jury was asked when KB Resources reached an enforceable agreement to sell its interest in Patriot Energy. The jury indicated the enforceable agreement was reached in November 2009. 10/3/16 Jury Interrogatory. The second is interrogatory number 13. This interrogatory concerned the defense of laches. The jury indicated it was unreasonable for Appellants to wait as long as they did to sue Appellees. 10/3/16 Jury Interrogatory.
{¶ 55} The jury returned defense verdicts on all of Appellants' claims. 10/3/16 Verdict Forms. As to Appellees counterclaim for breach of contract, the jury found Patriot Energy was entitled to receive an unconditional release of all claims and liabilities.
{¶ 56} Appellants filed a motion for judgment notwithstanding the verdict (JNOV) or new trial arguing the verdicts were against the manifest weight of the evidence and contrary to law. 11/14/16 Motion. Appellees responded asserting there was competent credible evidence supporting the jury's verdict and the verdict was not contrary to law. 11/28/16 Motion.
{¶ 57} The trial court journalized the jury verdict and entered final judgment for Appellees. 1/18/17 J.E. That same day the trial court also denied the motion for judgment notwithstanding the verdict and the motion for new trial. 1/18/17 J.E. The trial court stated there was substantial competent evidence in support of each of the defense verdicts. 1/18/17 J.E. The trial court also found a new trial was not warranted. 1/18/17 J.E. It found the verdicts were not contrary to law because the verdicts were consistent with the jury's interrogatory responses and the applicable law. 1/18/17 J.E. It also stated the jury did not lose its way and create a manifest miscarriage of justice requiring a new trial. 1/18/17 J.E.
{¶ 58} Appellants timely appealed the jury's verdict and the trial court's denial of the motions for JNOV and new trial.
{¶ 59} For ease of discussion and to lessen repetition, the assignments of error will be addressed out of order. The third assignment of error will be addressed first, followed by the fourth assignment of error, the first assignment of error, and then the second assignment of error.
Third Assignment of Error
"The jury's verdict was against the manifest weight of the evidence."
{¶ 60} The manifest weight standard in a civil case is the same as it is in a criminal case.
*742 Eastley v. Volkman , 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17. The Supreme Court has explained:
Weight of the evidence concerns "the inclination of the greater amount of credible evidence , offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief ."
(Emphasis sic.) Id. at ¶ 12, quoting State v. Thompkins , 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).
{¶ 61} When conducting a manifest weight review, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the verdict must be reversed and a new trial ordered. Eastley at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." Id. at ¶ 21, citing Seasons Coal Co., Inc. v. Cleveland , 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984), fn. 3.
{¶ 62} In arguing the jury verdict was against the manifest weight of the evidence, Appellants assert Hlavin and Blocksom knowingly withheld material information about the escalating price of the Patriot Energy leases and the multiple negotiations to sell the Patriot Energy leases while at the same time telling Appellants they could not sell the leases. As aforementioned, an interrogatory was submitted to the jury about when an enforceable agreement to sell Appellants' interest in Patriot Energy was entered. 10/3/16 Jury Interrogatory Number 12. The jury indicated an enforceable agreement was reached in November 2009. 10/3/16 Jury Interrogatory. Appellants acknowledge there was a November 2009 meeting between Krutowsky, Bartlebaugh, Dickey, and Blocksom. They also admitted at that meeting Krutowsky and Bartlebaugh clearly expressed a desire to get their money back, and Blocksom and Dickey expressed a willingness to discuss the matter further with Hlavin. However, Appellants strongly assert there was no agreement reached at the November 2009 meeting. In support of that position they state Hlavin never testified there was an agreement in November for the purchase of the KB Resources interest. He testified he only considered them out when he made the March payments to them. Tr. 1203. Appellants assert the jury's erroneous interrogatory response was material and likely dispositive in the ultimate judgment.
{¶ 63} However, Appellants admit if there was an enforceable agreement in November 2009, anything that happened after that time would be irrelevant to Appellants' claims of fraud and breach of duty because there would not have been a duty to share the information of later negotiations and increased value of the leases. Thus, the defense verdict would be justified if an agreement occurred in November 2009.
{¶ 64} Appellants also argue, given the facts presented at trial, the jury's determination that the defense of laches was applicable indicates the jury lost its way. Consequently, Appellants assert based upon either the erroneous belief that an enforceable contract existed in November 2009 or laches barred the claim, the jury's verdict does not "square" with the facts established at trial. They urge this court to find *743 the defense verdicts were against the manifest weight of the evidence and grant a new trial.
{¶ 65} Conversely, Appellees assert all the verdicts were supported by the manifest weight of the evidence. They contend the facts presented indicate two theories of the case. Appellants' theory at trial was that Appellees wanted them out because Appellees did not want Appellants to have the 2% priority override royalty; Appellees would not receive as much profit if Appellants had the 2% priority. Appellees' theory was Appellants had sellers' remorse and when they discovered how much the leases had sold for they "cooked up" a lawsuit accusing Appellees of forcing them out of Patriot Energy. Appellees assert it was for the jury to decide which theory to believe and the jury did not believe Appellants' theory.
{¶ 66} Appellees argue there was competent credible evidence Appellants agreed to be bought out in November 2009. There was the recording of the November 2009 meeting, which was played multiple times for the jury. Appellees testified they believed following the meeting that Appellants were out of the deal. Further, there was evidence that following the meeting Hlavin and Blocksom were seeking investors and Appellants knew this.
{¶ 67} Appellees also assert Appellant's argument only focuses on one element of fraud, materiality. The jury received multiple interrogatories, each covering different elements of the claims asserted against Appellees. The jury found none of the other five elements of fraud and found none of the elements of the other claims. Plaintiff's Fraud Claim Interrogatories. The first interrogatory to the fraud claims asked if Appellees knowingly or recklessly failed to disclose one or more material facts to Appellants or made false representation of material fact. Plaintiff's Fraud Claims Interrogatories No. 1; Plaintiff's Breach of Fiduciary Duty Claims Interrogatories No. 4; Plaintiff's Unjust Enrichment Claims Jury Interrogatory No. 6; Plaintiff's Civil Conspiracy Claims Jury Interrogatory No. 9; Plaintiff's Breach of Contract Claim Jury Interrogatory No. 12. Since all the interrogatories indicate Appellants did not prove a single element of any claim asserted against Appellees, the finding that an agreement was reached in November 2009 for KB Resources to be bought out of Patriot Energy cannot render the verdict against the manifest weight of the evidence.
{¶ 68} As to laches, Appellees assert Appellants' laches argument fails because laches is available to legal claims and there is no indication the jury focused on the laches instruction to the exclusion of all other instructions.
{¶ 69} Considering the parties arguments, the analysis under this assignment of error can be separated into two parts. The first part addresses the jury's determination that an enforceable agreement was entered in November 2009. The second part addresses the affirmative defense of laches.
1. November 2009
{¶ 70} The issue before us is whether there was competent credible evidence supporting the jury's indication that there was an enforceable agreement for KB Resources to be bought out in November 2009. The only event discussed at trial that occurred in November 2009 was the November 2009 meeting.
{¶ 71} A written contract was not signed at the November 2009 meeting. Thus, if an agreement was reached at the November 2009 meeting, it was an oral agreement. An oral agreement may be enforceable provided there "is sufficient particularity *744 to form a binding contract." Kostelnik v. Helper , 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 15. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration, a manifestation of mutual assent, and legality of object and of consideration. Id. at ¶ 16. "Proof of the terms of an oral contract rarely exists with the level of formality found in written contracts. Hence, the terms of an oral contract may be shown from the parties' words, deeds, acts, and silence." Id. at ¶ 15.
{¶ 72} The November 2009 meeting occurred at Krutowsky and Bartlebaugh's office; they asked Blocksom and Dickey to stop by to discuss the Patriot Energy leases. This meeting occurred a little over a year and half after Patriot Energy was formed. Krutowsky and Bartlebaugh believed the leases would sell within one year of acquisition. However, the leases had not sold by this point and the money Krutowsky and Bartlebaugh borrowed for the initial capital for Patriot Energy was coming due. Many of the loans allowed for a six month extension, but the loans were subject to approximately a 10% interest rate.
{¶ 73} The November 2009 meeting was recorded and played for the jury multiple times. Multiple questions were asked on direct and cross examination of Krutowsky, Bartlebaugh, Blocksom and Dickey about statements made during this meeting. A transcript of the recording was admitted at trial. Plaintiff's Exhibit 49.
{¶ 74} At this meeting, statements were made that Krutowsky and Bartlebaugh's investors wanted their money back and that Hlavin should come in and take over and make the investors whole:
Steve [Krutowsky]: I can show you emails, and I'll show them to you, they want their money back ...
Andy [Blocksom]: Yeah.
Steve [Krutowsky]: Now, it's been a year and half now?
Andy [Blocksom]: Yeah
Steve [Krutowsky]: A year and half, our leases are expiring ...
Andy [Blocksom]: Yep.
Steve [Krutowsky]: If we have to up them? What do I tell people that gave us, I believe, we put in $730,000?
Andy [Blocksom]: Yep.
Steve [Krutowsky]: What do I tell people how they're going to get back, their $730,000, when their asset is corroding behind it? I mean, it's going away ...
Andy [Blocksom]: Yeah, no, I understand.
* * *
Steve [Krutowsky]: You gave him; you have an equity interest in it also, but a guy that doesn't have the courtesy of communicating with us and that's what concerns me. Call us or tell us what's going on. If somebody handed you 3/4 of a million dollars, and if you don't call them up, they're going to start saying, "Listen, guys, what's going on? Where's our money? What are you working on?" etc., etc. Because we've got investors and I'm telling you they're going to litigate, I don't want to litigate, but ...
Bob [Dickey]: That's what's gonna happen ...
Steve [Krutowsky]: Yeah, they're going to sue us. We've got calls, and I'll show you emails, and they want it. And I paid off one guy $100,000 plus back interest. Now, the other one called. The one is Dr. Moyal, who happens to be a partner of Hlavin ...
Andy [Blocksom]: Right.
Steve [Krutowsky]: He wants his money back. You were there, he said ... gave me 30 days to pay him back. He wants $100,000, plus his interest, and I've paid interest already for the first year, he *745 wants his interest for the sec ..., going into the second year. We've paid out 70 some thousand in interest; I can show you that. And that's not rights, and Hlavin is not telling me anything, and he's the guy that's instrumental in putting us into this deal. And, uh, we would like to resolve it, and the way to resolve it is he takes it over. Whatever's left, it's his.
Andy [Blocksom]: Ok ...
Tom [Bartlebaugh]: We're not, at this point in time, we're not looking to make any money ...
Andy [Blocksom]: No, no, no ...
Tom [Bartlebaugh]: We're not, at this point in time, we're not looking to make any money ...
Andy [Blocksom]: Right ...
Bob [Dickey]: So we need to go back at him - or do you want to have another meeting with him?
Steve [Krutowsky]: That's up to Tom [Bartlebaugh] ...
Tom [Bartlebaugh]: Well, you know, I like Bill [Hlavin] a lot, you know, and uh, based upon the relationship, uh, sure we're going to meet again but, you know, see where it is now. You know, what has happened, and if nothing's happening, then, what is his proposal to ...
Andy [Blocksom]: Make this happen ...
Tom [Bartlebaugh]: to make these people whole?
Andy [Blocksom]: Correct ...
* * *
Bob [Dickey]: We need to decide, do you want us to go back to Bill and say, "Bill you have to do something, you've got to do something"?
Tom [Bartlebaugh]: Well, you guys started with Bill ...
Bob [Dickey]: Alright ...
Tom [Bartlebaugh]: And you and Bill came to us; yeah, I think that's first.
Andy [Blocksom]: Alright, alright. We don't have any problem saying that, we will. We will just tell him, hey you're going to have to do something. These guys need their money back and you've got, you're got to do it.
Tom [Bartlebaugh]: Well he's gotta, he's the oil and gas guy, he's been doing it 40 years, he ought to come up with a resolution.
* * *
Tom [Bartlebaugh]: You know, we're not looking to make any money.
Andy [Blocksom]: You just don't want to lose 3/4 of a million dollars.
Bob [Dickey]: Ok, alright, that's what we're going to do.
Steve [Krutowsky]: Plus interest.
Bob [Dickey]: Yeah.
Steve [Krutowsky]: Because we've paid it out already.
Plaintiff's Exhibit 49.
{¶ 75} Statements made at this meeting also indicated there was a fall in the market that possibly contributed to the inability to sell the leases quickly. Plaintiff's Exhibit 49, pg. 3-4. However, there was also an indication that Hlavin was not working hard to try to sell the leases. Plaintiff's Exhibit 49, pg. 3-6, 10-11.
{¶ 76} Krutowsky also stated at this meeting that Hlavin guaranteed them they would not lose their money. Plaintiff's Exhibit 49, pg. 9-10. Blocksom disputed there was a guarantee, rather he stated Hlavin probably said he would have no problem selling the leases. Plaintiff's Exhibit 49, pg. 9.
{¶ 77} At trial, both Blocksom and Dickey testified their impression from the November 2009 meeting was Krutowsky and Bartlebaugh had investors demanding their money back, Krutowsky and Bartlebaugh wanted out of Patriot Energy, *746 Krutowsky and Bartlebaugh wanted their initial investment plus interest, and Krutowsky and Bartlebaugh were threatening to sue Appellees. Tr. 884, 885, 890, 907, 912, 914, 1377-1378, 2115. Blocksom testified he was scared at this meeting and you could tell how scared he was by the way he was "jibbering" and how he sounded shaken. Tr. 886.
{¶ 78} Blocksom indicated following the meeting he told Hlavin his impression was that Krutowsky and Bartlebaugh wanted out of Patriot Energy and they wanted their money back. Tr. 890. Hlavin also believed Krutowsky and Bartlebaugh would sue him if he did not get their investment back. Gerry Jacobs, Hlavin's friend, testified Hlavin told him Hlavin believed Krutowsky and Bartlebaugh were going to sue him. Tr. 1090. Likewise, Lori Broughton, office manager for Hlavin's company Bass Energy, testified that Hlavin was visibly shaken after one of his telephone conversations with Krutowsky and stated Krutowsky told him if he did not come up with $150,000 to buy out Dr. Moyal, Krutowsky and Bartlebaugh would sue him. Tr. 1306. Furthermore, Hlavin testified he believed Krutowsky and Bartlebaugh wanted out of Patriot Energy and wanted their money back. Tr. 1203.
{¶ 79} A November 18, 2009 email to Ryan Cunningham, an oil and gas driller, provides evidence Blocksom believed Krutowsky and Bartlebaugh were out of the deal and just wanted their money back. Tr. 2110-2111; Exhibit LLL. Blocksom testified this email was sent after the November 2009 meeting with Krutowsky and Bartlebaugh. Tr. 2111; Defendant's Exhibit LLL. The email asked Cunningham to invest 1.3 million in Patriot Energy. Defendant's Exhibit LLL. Blocksom explained this figure was asked to cover the initial investment of $730,000 plus interest, which amounted to $850,000, plus the amount of delay rentals, which was about $350,000, and about $150,000 to pay back Hlavin for the previous injections of money into Patriot Energy. Tr. 2111.
{¶ 80} Furthermore, Blocksom testified after the November 2009 meeting, Krutowsky and Bartlebaugh were not requesting information or calling him anymore; their silence indicated they viewed themselves no longer part of Patriot Energy. Tr. 912.
{¶ 81} It is undisputed Krutowsky and Bartlebaugh were not informed of the majority of negotiations to sell their interest or the leases following the November 2009 meeting. In response to questions about those potential deals, Hlavin and Blocksom reiterated the reason for failing to inform Krutowsky and Bartlebaugh of the dealings was the belief that KB Resources was out of Patriot Energy.
{¶ 82} Given the discussion that occurred at the meeting and the other evidence, the jury could have believed there was an oral agreement at the November 2009 meeting for Appellants to be bought out of Patriot Energy. The jury could have believed Appellants demanded their money back plus interest at this meeting and Appellees agreed to that demand. The jury could also have believed the statements made by Krutowsky and Bartlebaugh were threatening a lawsuit if they did not get their investment plus interest back.
{¶ 83} Admittedly, Bartlebaugh and Krutowsky testified there was no agreement reached at this meeting and they were not threatening a lawsuit; Bartlebaugh testified the conversation was firm and he was just trying to "rattle their cage." Tr. 761. After hearing the recording played, the jury may have disbelieved that testimony. It may also have not believed Krutowsky and Bartlebaugh because they admitted some statements made at the meeting were not completely accurate. Bartlebaugh admitted there were no *747 emails from investors demanding money back. Tr. 2114. In fact, Dr. Moyal, the investor named during the November 2009 meeting who was allegedly asking for his money back, testified at trial that he did not ask for his money back and would have been interested in staying in the deal under the same terms of 8% interest. Tr. 2053; Dr. Moyal Depo. 53. He further indicated he was not worried when the loan was extended into the 6 month extension period because of the accumulation of additional interest. Tr. 2053; Dr. Moyal Depo. 46. A second investor, Marshall Goldman, also testified at the trial that he did not ask for his money back. Tr. 2177; Marshall Goldman Depo. 27-29. Bartlebaugh likewise testified there were no investors threatening to sue in November 2009. Tr. 728. Also potentially casting doubt on Krutowsky's credibility is his claim at the November 2009 meeting and at trial that Hlavin guaranteed him he would not lose money. Plaintiff's Exhibit 49; Tr. 1499. Krutowsky presented himself as an experienced business man who ran multiple companies and nursing homes his entire life. With that experience, common sense would indicate no business deal is risk free.
{¶ 84} It is acknowledged that on cross examination Hlavin stated he believed Krutowsky and Bartlebaugh were out of the deal at the end of February 2010. Tr. 1203. Krutowsky and Bartlebaugh admitted that at the end of February 2010 there was an agreement for KB Resources to be bought out of Patriot Energy by a third party for $850,000. Tr. 557, 572-573, 585, 1601, 1733. Within days of the agreement Hlavin (through Bass Energy) paid KB Resources $150,000 as a partial payment for the interest. Within two weeks, Hlavin paid KB Resources another $150,000. Tr. 596, 1222. The buyout agreement that was signed on May 13, 2010 indicated the agreement "memorialized their previous oral agreements regarding this transaction." Tr. 1313-1314; Plaintiff's Exhibit 159.
{¶ 85} Therefore, there was evidence that the agreement for KB Resources to be bought out did not occur until the end of February 2010. However, that evidence does not render the evidence that an agreement was reached in November 2009 unbelievable. Rather, it creates an issue for the jury to resolve. Jurors are free to believe some, all, or none of each witness' testimony, and they may separate the credible parts of the testimony from the incredible parts. State v. Barnhart , 7th Dist. No. 09 JE 15, 2010-Ohio-3282, 2010 WL 2749627, ¶ 42, citing State v. Mastel , 26 Ohio St.2d 170, 176, 270 N.E.2d 650 (1971). As such, when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible. State v. Gore , 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. Hunter , 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118. The trier of fact is in the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. Seasons Coal Co. , 10 Ohio St.3d at 80, 461 N.E.2d 1273.
{¶ 86} The jury heard the November 2009 meeting. The jury heard the persons attending that meeting testify what the meeting meant to them. The jury also heard each party's actions after the meeting. The May 2010 buyout contract was also before the jury and it indicated the contract was a memorialization of earlier oral contracts. The reference could have been to November 2009, February 2010, or both. It could be determined from the evidence the agreement to buy out KB
*748 Resources' interest for the initial investment plus interest was reached in November 2009. The oral agreement reached in February 2010 was that the capital investment plus interest equaled $850,000. The jury was in the best position to decide when the oral agreement was reached. Thus, there was competent credible evidence to support the jury's determination that there was an enforceable agreement entered in November 2009.
{¶ 87} Appellees alternative arguments as to why the defense verdicts can be affirmed on other grounds are moot based on that determination.
2. Laches
{¶ 88} The other argument made under this assignment of error addresses the jury's determination Appellants waited an unreasonable amount of time to sue Appellees, i.e., the jury found the affirmative defense of laches was applicable. Jury Interrogatory No. 13 stated, "Do you find by a preponderance of the evidence that Plaintiffs failed to assert a right for an unreasonable and unexplained length of time and that Plaintiffs' conduct proved materially prejudicial to Defendants?" 10/3/16 Jury Interrogatory No. 13. All members of the jury responded "yes." Tr. 2472; 10/3/16 Jury Interrogatory No. 13.
{¶ 89} Appellants assert laches is not available as a defense for a legal claim, rather it is an equitable remedy. Thus, when the jury found laches it was evidence that the jury lost its way, and thus, the defense verdicts are against the manifest weight of the evidence. Appellees assert Appellants' laches argument fails because laches is available to legal claims and there is no indication the jury focused on the laches instruction to exclusion of all other instructions.
{¶ 90} The Ohio Supreme Court has held the defense is available for legal claims; "in an appropriate case, the doctrine of laches is available to a defending party even though the proceeding is commenced within the relevant statute of limitations." Van DeRyt v. Van DeRyt , 6 Ohio St.2d 31, 38, 215 N.E.2d 698 (1966). The Court has further explained:
We agree with the court of appeals that laches may still operate as a bar to the enforcement of a claim even though the delay in enforcing the claim is less than the statutory period. Therefore, we hold that upon a clear showing of special circumstances, the defense of laches may be asserted prior to the expiration of the statute of limitations.
If we were to adopt appellee's argument in this realm, there could never be a laches defense in cases where a statute of limitations governs the time within which an action may be brought, regardless of any potential inequities. If laches cannot be raised in the proper case where the pertinent statute of limitations has not expired, it certainly could not be raised after the limitation period expired, because the limitation period itself would otherwise bar the action in any event.
Thirty-Four Corp. v. Sixty-Seven Corp. , 15 Ohio St.3d 350, 353, 474 N.E.2d 295 (1984).
{¶ 91} Therefore, the defense of laches is available if this is the "appropriate case." The determination of whether the case is an "appropriate case" is fact based. Id. at 353-354, 474 N.E.2d 295. In Thirty-Four Corp. , the Ohio Supreme Court found it was not an appropriate case because there was no material prejudice caused by the delay. Id. at 354, 474 N.E.2d 295. It explained:
Delay in asserting a right does not of itself constitute laches, and in order to successfully invoke the equitable doctrine of laches it must be shown that the *749 person for whose benefit the doctrine will operate has been materially prejudiced by the delay of the person asserting his claim.
Id.
{¶ 92} Case law indicates prejudice "may not be inferred from a mere lapse of time." Atwater v. King , 2d Dist. No. 02CA45, 2003-Ohio-53, 2003 WL 77181, ¶ 19. Also, "[t]he accumulation of interest and the absence of a timely demand for payment does not constitute material prejudice where the terms of the debt are set forth in the contract." Thirty-Four Corp. at 353, 474 N.E.2d 295. "Instead, to establish material prejudice,' the party invoking the laches doctrine must show either: (1) the loss of evidence helpful to the case; or (2) a change in position that would not have occurred if the right been promptly asserted." Dyrdek v. Dyrdek , 4th Dist. No. 09CA29, 2010-Ohio-2329, 2010 WL 2091649, ¶ 19, citing Donovan v. Zajac , 125 Ohio App.3d 245, 250, 708 N.E.2d 254 (1998).
{¶ 93} We do not need to address whether this case is an appropriate case for laches or whether the jury's determination of laches is against the manifest weight of the evidence. The jury found Appellees were not liable; all other interrogatories and jury verdicts indicated Appellants did not prove their case. The Ninth Appellate District has explained that any error in charging on an affirmative defense is not prejudicial when the jury answers "no" to the first interrogatory asking whether the defendant is liable. Roberts v. Falls Family Practice, Inc. , 9th Dist. No. 27973, 2016-Ohio-7589, 2016 WL 6493416, ¶ 13 (Action was negligence and affirmative defense was contributory negligence.). The interrogatory on the affirmative defense of laches was one of the last interrogatories given to the jury. Nothing in the record suggests the jury's laches determination was made prior to the liability determination on the claims. Furthermore, laches is an affirmative defense and by definition an affirmative defense is determined after liability has been determined. Since the jury's determination regarding the other claims is not against the manifest weight of the evidence, the jury's laches determination is both irrelevant and harmless for the above reasons.
{¶ 94} Although we do not need to decide if this is an appropriate case for laches and whether the laches determination is against the manifest weight of the evidence, given the evidence produced at trial it was an appropriate case and the decision was not against the manifest weight of the evidence.
{¶ 95} The evidence established that even before the Patriot Energy leases were sold, Appellants contacted their attorney and on August 9, 2010 a letter was sent to Appellees indicating Appellants felt they were defrauded and lied to about the value of the leases. Tr. 1290-1292. The letter alleged Blocksom and Hlavin represented to Krutowsky and Bartlebaugh at the time of the purchase agreement, there were no viable buyers, but that statement was false. Tr. 928. Appellants, however, did not file a claim at that time.
{¶ 96} Appellees gave the letter to their attorney at Buckingham, Doolittle, & Burroughs. Tr. 1293. On August 16, 2010 a letter was sent by Attorney Dowling of Buckingham, Doolittle & Burroughs in response to the August 9, 2010 letter from Appellants. Tr. 1292, 1767. The letter indicated Appellants were aware of the value of the Patriot Energy leases during the term of their ownership and they were kept apprised of the negotiations for the sale of the leases. Tr. 1293-1294. The letter further indicated Hlavin and Blocksom were not aware of the increased value of *750 the leases when they entered the agreement to buyout Appellants. Tr. 1295.
{¶ 97} Krutowsky testified he relied on this letter because it was from a reputable law firm; he testified the letter was part of the reason he did not immediately file suit against Hlavin, Blocksom, and Patriot Energy. Tr. 1616, 1618, 1745-1747. The other reason he did not file suit immediately was because he was having heart problems. Tr. 1745. Bartlebaugh similarly indicated he relied on the letter from Buckingham, Doolittle & Burroughs because it is a very reputable firm. Tr. 613.
{¶ 98} However, evidence also indicated Krutowsky and Bartlebaugh were previously sued and the attorney on the opposing side was Attorney Dowling from Buckingham, Doolittle & Burroughs. This was the Diplomate case where a large verdict was rendered against Krutowsky and Bartlebaugh. Attorney Dowling's testimony indicated he found it hard to believe, based on past dealings, that Krutowsky and Bartlebaugh would rely on a letter from his firm in deciding whether to file an action; the Diplomate case was a very ugly litigation and there was no trust between Buckingham, Doolittle & Burroughs attorneys and Krutowsky and Bartlebaugh's attorneys. Tr. 1785.
{¶ 99} In July 2014, almost four years after the letters and the sale of the Patriot Energy leases, Appellants filed suit against Patriot Energy. Testimony at trial indicated many witnesses could not remember when negotiations began on certain offers. Jacobs testified about notes he made about phone calls he had with Hlavin and some of the time because of the lapse of time, he could not remember what his notes actually meant.
{¶ 100} The above evidence indicates this is an appropriate case for laches and the laches determination was not against the manifest weight of the evidence. The lapse of time may have contributed to the loss of evidence; witnesses could not remember. Appellants indicated they felt cheated two months after the buyout agreement and a month before the actual sale of the leases. However, they waited roughly four years later to sue and witnesses' memories had faded. The evidence, if believed, is competent credible evidence Appellants' waited an unreasonable time and the delay materially prejudiced Appellees.
3. Conclusion
{¶ 101} For all the above stated reasons, this assignment of error is meritless.
Fourth Assignment of Error
"The trial court erred in instructing the jury on laches."
{¶ 102} Over Appellants' objection, the jury was instructed on laches:
Defendants assert the affirmative defense of laches. Laches is an omission to assert a right for an unreasonable and unexplained length of time, under circumstances that are materially prejudicial to the adverse party. If you find that Plaintiffs failed to assert their claims against Defendants in a reasonable length of time, and such delay caused material prejudice to Defendants, then you will find for Defendants.
T. 2240, 2431.
{¶ 103} As aforementioned, jury Interrogatory No. 13 asked, "Do you find by a preponderance of the evidence that Plaintiffs failed to assert a right for an unreasonable and unexplained length of time and that Plaintiffs' conduct proved materially prejudicial to Defendants?" 10/3/16 Jury Interrogatory No. 13. All members of the jury responded "yes." Tr. 2472; 10/3/16 Jury Interrogatory No. 13.
*751 {¶ 104} The arguments set forth in this assignment of error are very similar to the arguments made in the previous assignment of error. Appellants argue the laches instruction was improper because it is an equitable remedy and does not apply to the legal claims governed by the statute of limitations that were asserted against Appellees. Appellees argue laches is available as a defense to a legal claim and was appropriate in this case. They also assert, alternatively, if the instruction was inappropriate no prejudice resulted because the jury found Appellees were not liable. Thus, any error was harmless.
{¶ 105} As explained in the third assignment of error, the Ohio Supreme Court has held the defense is available for legal claims, in the "appropriate case" even though the proceeding was commenced within the relevant statute of limitations. Van DeRyt , 6 Ohio St.2d at 38, 215 N.E.2d 698. See also Thirty-Four Corp. , 15 Ohio St.3d at 353, 474 N.E.2d 295. An "appropriate case" is a factual determination. Thirty-Four Corp. at 353-354, 474 N.E.2d 295. A decision whether or not to apply the defense of laches is within the discretion of the trial court and will not be overturned absent an abuse of discretion. DeRosa v. Parker , 197 Ohio App.3d 332, 2011-Ohio-6024, 967 N.E.2d 767, ¶ 49 (7th Dist.).
{¶ 106} For the reasons expressed above, the trial court did not abuse its discretion by instructing on the defense of laches. The evidence in this case, if believed, could indicate Appellants waited an unreasonable time and the delay materially prejudiced Appellees.
{¶ 107} Regardless, even if the trial court erred in giving the laches instruction it was harmless error. Laches is an affirmative defense and regardless of whether the delay was unreasonable and prejudicial, the jury found no liability. Thus, the affirmative defense was immaterial and not needed to support the jury's defense verdict.
{¶ 108} This assignment of error is meritless.
First Assignment of Error
"The trial court erred in denying the new trial motion."
{¶ 109} As aforementioned, Appellants filed a Civ.R. 59(A) motion for new trial following the jury's verdict. 11/14/16 Motion. The basis for the motion was the assertion that the jury's decision was against the manifest weight of the evidence, division (A)(6), and contrary to law, division (A)(7); Appellants argued the jury's finding that KB Resources reached an enforceable agreement to sell its interest in Patriot Energy in November 2009 and the laches determination was against the manifest weight of the evidence and contrary to law. 11/14/16 Motion.
{¶ 110} The trial court denied the motion finding a new trial was not warranted. 1/18/17 J.E. It found the verdicts were not contrary to law because the verdicts were consistent with the jury's interrogatory responses and the applicable law. 1/18/17 J.E. It also stated the jury did not lose its way and create a manifest miscarriage of justice requiring a new trial. 1/18/17 J.E.
{¶ 111} The applicable standard of review of an order granting or denying a motion for new trial is based upon the specific grounds of the motion. Rohde v. Farmer , 23 Ohio St.2d 82, 262 N.E.2d 685 (1970), paragraphs one and two of the syllabus. See also, Catalanotto v. Byrd , 9th Dist, 2017-Ohio-7688, 97 N.E.3d 1016, ¶ 7 ; Gateway Consultants Group, Inc. v. Premier Physicians Centers, Inc. , 8th Dist. No. 104014, 2017-Ohio-1443, 2017 WL 1407306, ¶ 12 ; In re Estate of Flowers , 6th Dist., 2017-Ohio-1310, ¶ 97. If the basis of *752 the motion involves a question of law, the de novo standard of review applies, however, if the basis of the motion involves the determination of an issue left to the trial court's discretion, the abuse of discretion standard applies. Rohde at paragraphs one and two of the syllabus.
{¶ 112} With that standard in mind we turn to the arguments raised and address the manifest weight and contrary to law arguments separately.
1. Manifest Weight
{¶ 113} In reviewing a trial court's decision on a Civ.R. 59(A)(6) motion for new trial, we do not directly review whether the judgment was against the manifest weight of the evidence. Malone , 74 Ohio St.3d at 448, 659 N.E.2d 1242. Instead, appellate review focuses on whether the trial court abused its discretion in ruling on the Civ.R. 59(A)(6) motion. Id. An abuse of discretion implies that a trial court was unreasonable, arbitrary or unconscionable in its judgment. Blakemore v. Blakemore , 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Deference to the trial court's decision recognizes the trial court is in a better position to determine credibility issues. Malone at 448, 659 N.E.2d 1242.
{¶ 114} The arguments raised in the third assignment of error are the same arguments raised in this assignment of error. Appellants focus on the jury's finding that an enforceable agreement was entered in November 2009 and its laches determination.
{¶ 115} Under the third assignment of error we concluded the jury's defense verdict was not against the manifest weight of the evidence. Although there were different theories as to when the agreement was entered into by Appellants and Appellees, there was competent credible evidence that an enforceable agreement was entered into in November 2009. The jury believed that evidence. As to laches, since the jury found Appellees were not liable, any error concerning the laches determination or the instruction on laches was harmless. Regardless, there was competent credible evidence supporting the laches instruction and finding.
{¶ 116} Based on those determinations, we must conclude the trial court did not abuse its discretion in denying the motion for a new trial based on the argument that the judgment was against the manifest weight of the evidence. This assignment of error, as it pertains to Civ.R. 59(A)(6), is meritless.
2. Contrary to Law
{¶ 117} The assertion that the judgment is contrary to law is a question of law and requires a de novo review. Gateway Consultants Group, Inc. at ¶ 12. Thus, we review a trial court's ruling on a Civ.R. 59(A)(6) motion under a de novo standard of review. Id. A de novo review is conducted without deference to the lower court's decision. Dixon v. Conrad , 7th Dist. No. 04 MA 114, 2005-Ohio-6932, 2005 WL 3536482, ¶ 35.
{¶ 118} The basis for Appellants' argument that the judgment is contrary to law is the jury's determination that an enforceable agreement was reached in November 2009 and that the defense of laches was applicable. Once again, Appellants assert there was no evidence presented that a binding agreement was reached by the parties in November 2009.
{¶ 119} This argument fails for the same reasons it failed under the third assignment of error. The evidence indicates an oral agreement was reached at the November 2009 meeting. An oral agreement may be enforceable provided there "is sufficient particularity to form a binding contract."
*753 Kostelnik , 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, at ¶ 15. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration, a manifestation of mutual assent, and legality of object and of consideration. Id. at ¶ 16. "Proof of the terms of an oral contract rarely exists with the level of formality found in written contracts. Hence, the terms of an oral contract may be shown from the parties' words, deeds, acts, and silence." Id. at ¶ 15.
{¶ 120} The audio recording of the November 2009 meeting was played at the trial, a transcript of that meeting was submitted as evidence, and numerous questions about statements made during that meeting was asked and answered. Furthermore, testimony and evidence established how the parties acted following this meeting and before this meeting. Portions of that recording were set forth above. In that meeting Krutowsky indicated the way to resolve the issue between them was for Hlavin to take over; "we would like to resolve it, and the way to resolve it is he [Hlavin] takes it over. Whatever's left, it's his." Plaintiff's Exhibit 40, pg. 7. Bartlebaugh and Krutowsky also stated they were not looking to make any money, they just wanted their investment plus interest back. Plaintiff's Exhibit 40, pg. 7, 12. Blocksom and Dickey said "ok" and they would go to Hlavin and tell him Krutowsky and Bartlebaugh needed their money back plus interest. Plaintiff's Exhibit 40, pg. 7, 12. This is an offer and acceptance to buyout KB Resources. Admittedly the amount is not set forth in dollar figures but it is set forth as the investment plus interest, which is computable.
{¶ 121} Furthermore, the testimony established Blocksom, Dickey, and Hlavin all believed Krutowsky and Bartlebaugh were out of Patriot Energy after this meeting. Tr. 1203. In a November 18, 2009 email to Ryan Cunningham Blocksom asked for a $1.2 million capital investment to buyout the "non oil money people" and to make delay rental payments. Tr. 2110-2111; Exhibit LLL. Blocksom also testified after the November 2009 meeting, Krutowsky and Bartlebaugh were not requesting information or calling him anymore. Tr. 912.
{¶ 122} Krutowsky and Bartlebaugh testified they did not agree to be bought out at the November 2009 meeting and they were not out of Patriot Energy following the November 2009 meeting. In their brief, they admit they made clear their desire to get their money back, and that Blocksom and Dickey expressed a willingness to discuss the matter further with Hlavin, but strongly assert there was no agreement reached. They testified the language used by them at the November 2009 meeting was to try to get answers from Hlavin, not to reach a buyout agreement at that time. Bartlebaugh also testified he made inquiries about the Patriot Energy leases following the November 2009 meeting.
{¶ 123} Although there may have been different interpretations of what the language used in the November 2009 meeting meant, and whether Krutowsky and Bartlebaugh agreed to be bought out at the November 2009 meeting, the conflicting evidence does not render the verdict contrary to law. Rather, the evidence indicates this was a factual determination for the jury.
{¶ 124} As to laches, Appellants assert the defense is equitable and may not be asserted in a legal action.
{¶ 125} As explained above, per the Ohio Supreme Court, laches may be available as a defense in a legal action in the "appropriate case." Thirty-Four Corp. , 15 Ohio St.3d at 353, 474 N.E.2d 295. Thus, there is no blanket rule it is not available. Rather, the issue is whether the facts warranted a laches instruction.
*754 {¶ 126} As explained above, we do not need to determine whether this is an "appropriate case" for a laches defense. Even if the laches instruction should not have been given, any error in charging on an affirmative defense is not prejudicial when the jury answers "no" to the first interrogatory asking whether the defendant is liable. Roberts , 2016-Ohio-7589, ¶ 13. Therefore, even if the laches instruction should not have been given there was no prejudice because the jury found no liability. Regardless, as also explained above, the facts of this case probably warranted a laches instruction; this was an "appropriate case" for laches.
3. Conclusion
{¶ 127} For those reasons and the ones discussed under the third assignment of error, we conclude this assignment of error lacks merit. The trial court did not err when it denied the Civ.R. 59(A) motion for new trial motion.
Second Assignment of Error
"The trial court erred in denying the JNOV motion."
{¶ 128} In Appellants motion for JNOV, they argued the jury lost its way when it found KB Resources reached an enforceable agreement to sell its interest in Patriot Energy in November 2009. 11/14/16 Motion.
{¶ 129} The trial court denied the motion finding there was substantial competent evidence to support each of the defense verdicts. 1/18/17 J.E.
{¶ 130} Appellants argue the trial court erred when it denied the motion for judgment notwithstanding the verdict. Appellants assert reasonable minds could only reach one conclusion, which is that KB Resources did not enter into an enforceable agreement in November 2009 to divest its interest. Accordingly, if there was no agreement then there was sufficient evidence to establish Appellees liability on the fraud, breach of fiduciary duty, breach of contract, and civil conspiracy claims.
{¶ 131} Appellate courts review decisions to grant or deny a motion for JNOV under a de novo standard of review. Environmental Network Corp. v. Goodman Weiss Miller, LLP , 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 22. Thus, we use the same test the trial court applies when it is determining whether to grant or deny the motion.
{¶ 132} A motion for JNOV under Civ.R. 50(B) tests the legal sufficiency of the evidence. Eastley , 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, at ¶ 25 (a motion for JNOV presents a question of law). Thus, when a verdict has been returned, the trial court, in determining whether to sustain a motion for judgment notwithstanding the verdict, must decide whether the moving party is entitled to judgment as a matter of law when the evidence is construed most strongly in favor of the nonmovant. Texler v. D.O. Summers Cleaners & Shirt Laundry Co. , 81 Ohio St.3d 677, 679, 693 N.E.2d 271 (1998), citing Civ.R. 50(A)(4). In determining whether to grant or deny a Civ.R. 50(B) motion, the trial court should not weigh the evidence or evaluate the credibility of the witnesses. Malone v. Courtyard by Marriott , 74 Ohio St.3d 440, 445, 659 N.E.2d 1242 (1996).
{¶ 133} This assignment of error is premised on the position that reasonable minds could not conclude there was an enforceable agreement entered in November 2009. If this premise fails, Appellants acknowledge their claims fail.
{¶ 134} For the reasons expressed in the previous assignments of error, reasonable minds could conclude there was an enforceable agreement in November 2009.
*755 The audio recording of the November 2009 meeting was played for the jury. Evidence of how the parties acted after the meeting was presented to the jury. A reasonable interpretation of the statements made at the November 2009 meeting is KB Resources wanted to be bought out, the price for the buyout was the initial investment plus interest, and Appellees agreed to the buyout. The actions of the parties following the meeting, including an email sent from Blocksom to a potential investor/buyer, could lead a reasonable person to believe KB Resources agreed to be bought out. Therefore, a reasonable interpretation of the parties' statements and actions, when viewed in the Appellees' favor, indicate an agreement was reached in November 2009. The trial court did not err in denying the motion for JNOV. This assignment of error is meritless.
CONDITIONAL APPEAL
Conditional First and Second Assignments of Error
"The trial court erred by admitting the expert opinion testimony of Robert Brlas, which was entirely based on facts not in evidence."
"The trial court erred by denying Defendants' motion for directed verdict on all claims on the issue of damages."
{¶ 135} Appellees filed a conditional appeal if this court found merit with Appellants appeal. As set forth above, we find no merit with Appellants' appeal and affirm the jury's verdict and the trial court's rulings. Therefore, the assignments of error raised in the conditional appeal are moot.
CONCLUSION
{¶ 136} The jury's verdict is affirmed. The trial court's denial of Appellants motion for new trial and motion for JNOV is affirmed.
Donofrio, J., concurs.
Waite, J., concurs.